454 So.2d 488 (1984)
Terry Wayne McDONALD
v.
STATE of Mississippi.
No. 54903.
Supreme Court of Mississippi.
July 25, 1984.
Richard Hamilton, Fielding L. Wright, Wright & Hamilton, Pascagoula, for appellant.
Bill Allain, Atty. Gen., by Walter L. Turner, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and PRATHER, JJ.
HAWKINS, Justice, for the Court:
Terry Wayne McDonald appeals from his conviction of conspiracy to possess and distribute marijuana and sentence of five years and $5,000.00 fine. He was one of seven indicted for this crime.
Numerous errors are assigned on his appeal, but we address only one. Because we are convinced the State never made a jury issue on McDonald's being a co-conspirator, we reverse and render.

FACTS
On Friday, November 21, 1980, Terry Wayne McDonald was 26 years old, married, the father of two children, and a deputy sheriff investigator with the sheriff's office of Jackson County. (He had worked for 2 1/2 years with that department, beginning *489 as a jailer.) He had received an honorable discharge from the United States Army, after serving in the Green Berets. He had no sisters, and only one brother, Mack McDonald.
Because there are two McDonalds, we will refer to each by his first name.
Mack got Terry into one pack of trouble.
This case involves several individuals dealing in a large quantity of marijuana, and we will begin as the matter was related by the state's star witness at trial: Dan Westphal.
Westphal and four others learned of a shrimp boat of marijuana off the coast, and the five of them agreed to unload the marijuana, sell it and share equally in the proceeds. The other four in this agreement were: Kenneth and Graylon Hester, Tom Gruen and Roy Paine.
Two to three days before the arrival of the marijuana off the coast, Westphal contacted Mack about locating a place to store the marijuana. There was no set amount Mack was to be paid. According to Westphal, "It could be part of the loot, part of the marijuana in payment. It wasn't important to either one of us to settle on a straight amount."
Westphal, the Hesters and Paine made the trip out in a shrimp boat called "Rendezvous", to the West end of Petit Bois Island, and removed about one-half the marijuana cargo from the other boat, loading it onto the Rendezvous. They docked at a local boat repair yard, and unloaded about one-half of the marijuana from the Rendezvous. Gruen was on shore. They had a load of over two tons.
The marijuana taken off the boat was loaded into a white Chevrolet closed van truck. Westphal, Gruen and Graylon Hester went in the truck to meet Mack, who then escorted them to the residence of Tom Hinton in Jackson County. All of the group wound up at Hinton's residence, where the marijuana was unloaded into his hothouse.
Hinton's involvement in the matter began with a telephone call he received on Friday morning, November 21. It was Mack. Hinton testified:
And he asked me would I help him with something. He didn't really imply what it was. And when he got to my house, there was a big truck following him. It was about 4:00 in the morning. And he walked up to my door and was talking to me. I asked him what the big truck was, and he told me. I told him he could not leave it at my place. He told me not to kick up too much fuss, that the guys in the truck had a gun, or guns, and that I needed to try to help him if I could some way or another. So we bickered back and forth, and this guy named Westphal steps up; he was riding with Mack at the time. He made offers of what he would do for me if I would help them out, and this, that and the other. [Emphasis added]
Hinton permitted the party to unload the marijuana into his hothouse, but after their departure both he and his wife were quite uncomfortable. He telephoned Mack and told him the marijuana would have to be moved.
Hinton and the McDonalds had been lifelong friends, in public school together. The McDonalds also knew another individual from school days, Ray Stewart, but Terry was not on such good terms with him, having once arrested Stewart for auto theft.
Over in the late afternoon, about dark, of the day the marijuana was placed in Hinton's hothouse, Mack telephoned his brother Terry to come over to his house, and from his voice Terry detected some urgency.
As Terry drove into Mack's driveway, Ray Stewart drove in front of the house on the highway. Terry was inquiring the reason Mack wanted him, and was told there was no time, that it was getting dark, and to get into his truck and follow him to Hinton's house. Thereupon, the three of them, each driving his own pickup, drove to Hinton's house.
Terry testified:

*490 Well, they pulled down by the greenhouse and I pulled right in behind them. I got out of my truck. And Mack and Tom were standing there at the door of the greenhouse, just on the other side of the opening of the door. I walked up to them and asked them what they wanted. About that time I walked up and the door was open, so I looked in the greenhouse. There was a pile of marijuana in there.
* * * * * *
I told them a bunch. I threatened them. I cussed them out. I was outraged by the whole thing; for them to take me down there, you know, and get me involved in it. I threatened them; I told them I was going to the law and have them busted, and everything else. I told them if they ever fooled with anything, they was going to get busted. I said they was going to get rid of it right then and there.
Mack told Terry that was what Stewart was for, and Stewart responded he wanted it.
Terry helped Stewart and Mack haul the marijuana from Hinton's house over to a shop behind Stewart's house. Stewart lived about four miles from the Hintons, and each pickup truck made two trips with marijuana, taking about 45 minutes altogether.
Asked what he thought when he saw the marijuana, Terry responded:
I thought they were in a lot of trouble and I wanted them to get rid of what they had. That's all I could think about. They were in over their heads in something that was dangerous. It was powerful people they were fooling with. People can very easily get killed over two tons of marijuana. And I realized that. What I had on my mind was they were going to get rid of it and they weren't going to be involved in it or exposed to it no longer. And if they was, then I would bust them.
Asked why he had not arrested them then, Terry responded:
Uh , that would just be hard to do; arrest my only brother I had and a lifelong friend of mine. I felt I could get them to understand and leave the stuff alone and not get involved in this kind of stuff. I know I made a mistake; I know I should have. Maybe I should have done something  I don't know. But it was right then a split-second decision making deal. And a lot of that didn't really cross my mind, except the part that they were in danger and they were fooling with something they had no business messing with.
Stewart was promised $2,500 by Mack to store the marijuana. Stewart never received any money. Mack never received any money, and Hinton never received any money. Other than what has been related, Terry had nothing to do with the marijuana. He did not know Westphal, either of the Hesters, Gruen or Paine.
Westphal and the others later removed the marijuana from Stewart's shop over a period of time and sold it off in lots. Westphal made over $45,000. Some of the marijuana went to Alabama. Westphal was arrested February 19, 1981, with a large quantity of marijuana and $10,000 to $11,000 cash.
The only persons involved in the marijuana who testified were Westphal, Hinton, Stewart and Terry. There was no dispute in any of the testimony, except Stewart testified that Mack offered him $2,500 to store the marijuana, that they were at Mack's house at the time, and Terry was present. Terry vehemently disputed this, and Terry's version is borne out by Hinton, who was a state witness, and who said Terry was upset and angry with them over getting involved at all.
Terry's total involvement was the 45 minutes it took for him to make two trips with marijuana in his pickup from Hinton's house to Stewart's on the night of November 21, 1980.
Terry had no dealings at any time with Westphal, the Hesters, Gruen or Paine. He knew nothing about them.
*491 Following Westphal's arrest, there was an investigation, and Terry was asked about a large quantity of marijuana in the north end of the county. He said he had been informed by a confidential informant that it had belonged to a man named Dan Westphal in Gautier. He had concluded that the marijuana was Westphal's.
On October 12, 1982, Gruen, the Hesters, Hinton, one Larry Holmes, Terry and Mack were indicted by the Jackson County Grand Jury charging that between November 1, 1980, and December 31, 1981, they did:
... feloniously conspire, combine, confederate and agree together and with each other and with diverse and other persons whose names are to the Grand Jurors unknown, to commit a crime against the State of Mississippi; namely, to possess a controlled substance, to-wit: over one (1) kilogram of Marijuana, with intent to distribute, ...
Westphal had been indicted for another offense, and although he was obviously the ring leader and main beneficiary, for his testimony the State agreed not to indict him, and granted him immunity for his part in this crime. Stewart was never indicted. Paine was never indicted.
All of the individuals indicted with the exception of Terry pleaded guilty.
The circuit judge overruled a motion for a directed verdict of acquittal at the conclusion of the State's case.

LAW
Numerous errors have been assigned on this appeal. We only address the question of whether there was a jury issue made that Terry engaged in a conspiracy under Miss. Code Ann. § 97-1-1 (1972).
The State chose not to charge him with being an accessory after the fact, or with possession of marijuana. We are thus faced with the narrow question of whether from this record there was proof from which any jury could have concluded beyond a reasonable doubt that Terry was a "conspirator" under the statute.
Miss. Code Ann. § 97-1-1 (1972) provides:
If two (2) or more persons conspire either:
(a) To commit a crime; or
* * * * * *
(f) To commit any act injurious to the public health, to public morals, trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws; or
(g) To overthrow or violate the laws of this state through force, violence, threats, intimidation, or otherwise; or
(h) To accomplish any unlawful purpose, or a lawful purpose by any unlawful means; such persons, and each of them, shall be guilty of a felony and upon conviction shall be fined not less than five hundred dollars ($500.00) nor more than five thousand dollars ($5,000.00) or shall be imprisoned not less than one (1) year nor more than five (5) years or both.
Provided, that where the crime conspired to be committed is a misdemeanor, then upon conviction said crime shall be punished as a misdemeanor as provided by law.
Long ago, in Ellzey v. State, 57 Miss. 827 (1880), we did state: "A conspiracy is defined to be a confederacy of two or more persons to accomplish some unlawful purpose." In Moore v. State, 290 So.2d 603 (Miss. 1974), we stated: "By its very nature conspiracy is a joint or group offense requiring a concert of free will." At p. 604.
We find no decisions from this Court of any benefit on the specific question of whether the facts of this case made Terry a co-conspirator. Indeed, this Court has had but few occasions to deal with criminal conspiracy. In most crimes the conspirators and perpetrators were simply charged as principals in the criminal offense; Miss. Code Ann. 97-1-3 (1972).
The United States Courts, on the other hand, have dealt with a plethora of criminal conspiracies, and there we find ample authority.
In United States v. Peoni, 100 F.2d 401 (2nd Cir.1938), Peoni had passed some *492 counterfeit bills. He was charged with possession of counterfeit money and conspiracy to possess.
In holding Peoni was not a co-conspirator, the Court stated, page 403:
At times it seemed to be supposed that, once some kind of criminal concert is established, all parties are liable for everything anyone of the original participants does, and even for what those do who join later. Nothing could be more untrue. Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it. [Emphasis added]
In United States v. Falcone, 109 F.2d 579 (2nd Cir.1940), affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), the accused Falcone was indicted under a federal conspiracy statute along with numerous others engaged in manufacturing untaxed whiskey. Falcone was a wholesaler, selling sugar to the participants. In reversing his conviction, the Court stated:
It is not enough that he does not forego a normally lawful activity, of the fruits of which he knows that others will make an unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome. The distinction is especially important today when so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders. That there are opportunities of great oppression in such a doctrine is very plain... [Emphasis added] [At 581]
In United States v. Andolschek, 142 F.2d 503 (2nd Cir.1944), the numerous government agents were indicted in a conspiracy to take bribes. Herskowitz on appeal alleged it was not proven he had been a member of the conspiracy, although he may very well have engaged in some criminal acts. Again, the Court states as to a conspiracy:
It is true that at times courts have spoken as though if A. makes a criminal agreement with B., he becomes a party to any conspiracy into which B. may enter, or may have entered, with third persons. That is of course an error: the scope of the agreement actually made always measures the conspiracy, and the fact that B. engages in a conspiracy with others is as irrelevant as that he engages in any other crime. It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them. Nevertheless, he must be aware of those purposes, must accept them and their implications, if he is to be charged with what others may do in execution of them. [Emphasis added] [At 507]
In Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1945), the accused Bollenback sold some of the securities which had been stolen. He was indicted for conspiracy to transport stolen securities. The United States Supreme Court held:
Bollenbach could not properly be convicted for the offense for which he was charged and for which he was convicted, namely, for having conspired to transport securities across State lines merely on proof that he was a "fence," i.e., helped to dispose of the stolen securities after the interstate transportation was concluded. While § 332 of the Criminal Code, supra, made aiders and abettors of an offense principals, Congress has not made accessories after the fact principals. Their offense is distinct and is differently punished. [Statutes omitted] [326 U.S. 611, 66 S.Ct. 404, 90 L.Ed. 353]
To the same effect is Cleaver v. United States, 238 F.2d 766 (10th Cir.1956), where the defendant Colasacco helped dispose of *493 stolen property, the Court held this was insufficient to constitute him a co-conspirator in the crime of conspiring to commit burglary.
Roberts and Bookout v. United States, 416 F.2d 1216 (5th Cir.1969), is illustrative of this case. Bookout, Roberts and Cocco were charged in three count indictments with (1) committing and aiding and abetting uttering and publishing counterfeit money, (2) passing two counterfeit bills, and (3) conspiring to pass, utter and publish counterfeit money.
Bookout was the common-law wife of one Capatorto, and they lived in the same home with a Pat Miller. Capatorto, Miller, and one John Cocco and Carl Roberts all conspired to pass counterfeit money. They assembled in the home of Capatorto and Miller, and there made their arrangement. Bookout was not present at their plans, was across the hall in the bathroom, but presumably knew what was going on. The men left to pass counterfeit money at a race track.
After the men left, the two women left to go shopping in Fort Lauderdale. They ate at a drug store, following which Miller told Bookout she was going to try and pass a bogus bill, and Bookout warned her against it. Bookout paid for her meal with her own good money. When Miller attempted to pass a bogus bill, the clerk summoned the police by phone. Before the police arrived, Miller gave Bookout the remaining nine bills she had, and asked her to get rid of them, her reason being she did not want Bookout to get involved. Bookout took the money and burned it.
Was Bookout a co-conspirator? The Court stated, pp. 1220-1221:
Viewed in the light most favorable to the government, the evidence shows only that Bookout knew of the conspiracy, associated with guilty parties, and destroyed counterfeit money. Bookout's knowledge that there was a plan to pass the counterfeit could reasonably be inferred from two incidents. First, she entered the room while the discussion as to how to pass the bills was occurring. From this the jury was entitled to infer that Bookout had knowledge that there was counterfeit money spread out on the bed and that plans were being made to pass it. Second, Miller testified that Bookout warned her against attempting to pass the bill. This, of course, is further evidence of the fact that Bookout knew of the plan and knew that the money was counterfeit.
Miller's testimony that Bookout destroyed the balance of the counterfeit given to her by Miller no doubt weighed heavily against Bookout with the jury. It seems a reasonable assumption that the jury drew the inference that the destruction of the money demonstrated Bookout's agreement to enter the conspiracy. Essentially then, our task is to determine if this inference was reasonable.
It is elementary that neither association with conspirators nor knowledge of illegal activity constitute proof of participation in a conspiracy. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). The elements of a conspiracy are an agreement by two or more persons to combine efforts for an illegal purpose and an overt act by one of the members in furtherance of the agreement. United States v. Falcone, supra; Nelson v. United States, 5 Cir.1969, 415 F.2d 483; Castro v. United States, 5 Cir.1961, 296 F.2d 540; Duke v. United States, 5 Cir.1956, 233 F.2d 897.
In circumstantial evidence cases such as this, "the test to be applied on motion for judgment of acquittal and on review of denial of such motion is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude". Harper v. United States, 5th Cir.1969, 405 F.2d 185 quoting Vick v. United States, 5 Cir. 1954, 216 F.2d 228. Crediting all the evidence and all reasonable inferences most favorable to the government, we are unpersuaded that the jury *494 could reasonably exclude the hypothesis that Miss Bookout did not enter into the conspiracy to utter the counterfeit currency.

Miss Bookout did nothing and said nothing from which the jury could reasonably infer that she entered the conspiratorial agreement prior to the attempt by Miller to pass the bill in the Broward Drug Store. Certainly, no event occurred in the Capatorto home supportive of such an inference. At most, the evidence reveals that Bookout first gained knowledge of the plan when she entered the Miller bedroom to comb her hair. She did not indicate at the time that she gave any attention to the transaction and conversation underway at the bed, but the government is entitled to the inference that she overheard plans being discussed as to methods of using the money.
Nothing that happened at the Broward Drug Store prior to Bookout's destruction of the money aids the government's case. Indeed, the fact, as related by Miller that Bookout warned her not to pass the money indicates rather strongly that as of that time Bookout was not agreeable to becoming a partner in the conspiracy, the object of which was to pass the money. Bookout's payment for her own lunch with legitimate currency is an additional contradiction to her being a member of the conspiracy. It would seem reasonable for a conspirator to use the available counterfeit.
Ultimately then, the government must depend primarily upon the fact that Bookout destroyed the remaining bills to support the proposition that she was a member of the conspiracy. It is of course true that a person may be held as a conspirator regardless of the point in time at which he enters it, so long as he enters it with intent to further its objects during the life of the conspiracy. Nelson v. United States, supra; Lile v. United States, 9 Cir.1958, 264 F.2d 278, 279. The government's theory is then that if Bookout had not agreed previously to enter the conspiracy she adopted the aim of the conspiracy to pass the counterfeit money by destroying the money to prevent discovery of the existence of the conspiracy and to permit it to continue as a going partnership in crime. The reasonableness of this hypothesis may be assumed. But, it is by no means the only reasonable hypothesis. The first to suggest itself is that her action was taken on the spur of the moment as an act of compassion for her friend, Miss Miller. In view of the other circumstances (1) that Miss Bookout did not use any of the money; (2) that she was not a part of the discussion of the counterfeit money in the Miller bedroom; (3) that she paid for her lunch with her own funds even though an opportunity to pass the counterfeit was present; and (4) that she was told to destroy the funds by an alleged co-conspirator who did not want Bookout "to get involved", it simply cannot be asserted that the sole reasonable inference to be drawn from her destruction of the money was that she was a member of the conspiracy. As indicated, Bookout's act was as consistent with the hypothesis that she destroyed the money simply in order to help Miller. The latter we view as the more reasonable of the two assumptions when the other circumstances are weighed. Only the one circumstance may be said to point to guilt as well as to innocence. The other circumstances clearly point to innocence.
In sum, we are left with an abiding conviction that the jury's verdict of guilty as to Bookout is based upon suspicion and surmise only. She associated with the wrong people and was convicted because of guilt by association only. Her conviction for conspiracy may not be permitted to stand since we conclude that the inference of her guilt was not a reasonable one for the jury to entertain.
Conspiracy is a word of amorphous meaning, used in factual situations as broad as human behavior. We do not in this opinion attempt to define its many different *495 shades of meaning, or the outer limits of its application to criminal behavior. We merely decide whether Terry Wayne McDonald's offense ever reached any standard of proof required for such a crime.
To constitute an individual a co-conspirator, there must be a recognition on his part that he is entering into some kind of common plan, and knowingly intends to further its common purpose. Terry was charged with knowingly entering into a scheme with certain persons for the purpose of possessing marijuana with the intent to distribute.
Terry was trying to extricate his brother and a very good friend. He violated the law when he possessed and transported the marijuana. He may very well have been an accessory after the fact under Miss. Code Ann. § 97-1-5 (1972). For some reason which escapes us, the state chose to charge him with the crime of conspiracy.
For the reasons stated, the judgment of conviction is vacated, and appellant discharged.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ. concur.