James Donald Watson was indicted, tried and convicted in the Circuit Court of DeSoto County for conspiracy under Mississippi Code Annotated § 97-1-1(d) (Supp. 1985). The lower court, Honorable George C. Carlson, Jr., presiding, sentenced Watson to serve five (5) years in the custody of the Mississippi Department of Corrections, and to pay restitution in the amount of forty-nine thousand eight hundred forty dollars ($49,840), together with a fine of five thousand dollars ($5,000). He has appealed to this Court and assigns eight (8) errors in the trial below.
 Facts
For some time prior to 1983, appellant had been operating a so-called magazine business, which, to say the least, was shady and spurious. In early 1983, appellant was experiencing financial difficulty as a result of having his operations in the State of Tennessee enjoined, and being unable to open a merchant account with any local or other banks who knew him. He sought a "billing agent," specifically, a local merchant through whose bank account he could process the credit card charge slips he acquired in his magazine subscription business.
Appellant was introduced to Howard C. Rouse through mutual acquaintances, Bill Amos and Ken Herman. Appellant and Rouse met during the first week of March, 1983, and discussed the magazine subscription business. Watson explained to Rouse that he ran a "boiler room" magazine solicitation business, which received numerous credit card charges, and he explained the necessity of appellant's having access to someone else's merchant account in order to collect the money from those credit card charges. Appellant and Rouse agreed that Rouse would keep the first five thousand dollars ($5,000) in credit card deposits in his bank account as security. Thereafter, Rouse was to receive twenty percent (20%) of all Watson's credit card deposits processed through his account. Thus the plan and agreement were made, which were soon to develop into the conspiracy, resulting in appellant's conviction.
On March 9, 1983, appellant's first deposit was made into the Rouse account of "Elvis, Elvis, Elvis" in the First National Bank of Hernando, Mississippi. After rapidly acquiring the $5,000 in security, a routine involving appellant's credit card slips was orchestrated between appellant and Rouse. Bill Pitts, a maintenance and odd-job man working for appellant, daily would pick up a sealed envelope containing credit card slips. Pitts would deliver these envelopes to the Elvis, Elvis, Elvis establishment where he received a receipt and a check, payable to himself, from either Rouse or Sara Baney, the manager of Elvis, Elvis, Elvis. On each check payable to Pitts, either Rouse or Sara Baney made a notation that the check was for "videotapes," even though Rouse never purchased any videotapes from Pitts. The checks received from Rouse were carried by Pitts to Rouse's bank, the First National Bank of Hernando, where he cashed them and then delivered the cash to appellant. This procedure continued for approximately twenty-four (24) days from March 9 through April 1, 1983.
The credit card slips which appellant transmitted to Rouse for deposit and collection through the Rouse account of Elvis, Elvis, Elvis were treated and honored by the bank as check deposits and were forwarded by the bank through the regular channels for collection. As a result of the marked increase in credit card activity in Rouse's account after March 9, officials from the First National Bank of Hernando visited Elvis, Elvis, Elvis and discussed the *Page 1292 
situation with Rouse, who explained that his sales were high due to a new Elvis Presley video that he was marketing. Rouse never mentioned his association with appellant or the magazine solicitations.
In early April, 1983, the First National Bank of Hernando froze the Elvis, Elvis, Elvis account. Bank statements produced at trial revealed that approximately seventy thousand dollars ($70,000) in "charge backs" were assessed against Rouse's account during the period from March 9 through April 1 of 1983.[1]
Following the bank's action, appellant met with bank officials and explained that he had been involved with Watson in a magazine subscription venture.
The record reflects that Rouse's deposits, which ordinarily were five hundred ($500.00) to one thousand dollars ($1,000.00), increased to seven ($7,000) and eight thousand dollars ($8,000); that appellant would obtain credit card account numbers from various people and would double and triple the billing and falsify the billing; that one magazine solicitation venture was registered in the name of Deborah Jean Wilder, a long-time employee of appellant's magazine solicitation business; and that there were eight (8) or nine (9) arrangements similar to the one with Rouse through which appellant deposited the credit card charge slips from his magazine solicitations. The following excerpt from the testimony of Deborah Jean Wilder describes one facet of the operation:
 Q. And what would happen if you called Master Card or Visa for an authorization code and found out that the card holder's card had expired, the expiration date had passed?
 A. We would move it up a year and a month, a month and a year ahead of whatever the expiration date was, and call back again to get a code, and usually we'd get one.
 Q. So, if the card had a February '83 expiration date —
 A. We'd go to March of '84, and we'd call back.
 Q. — and you called in and you would be rejected on that, then you would call back later and add a year and a month to it?
 A. Yes, sir.
 Q. Which was a bogus expiration date?
 A. Yes, sir.
 Q. And who told you to do that?
 A. Mr. Watson.
 Q. Now, you also mentioned that when you would call Master Card or Visa for an authorization code and when you were rejected, you would just make up a code?
 A. Yes.
 Q. Just a bogus authorization code?
 A. Yes, sir.
 Q. And who told you to do that?
 A. Mr. Watson.
The DeSoto County grand jury returned an indictment on November 29, 1983, charging appellant James Donald Watson and Howard C. Rouse with conspiracy to defraud the First National Bank of Hernando, Mississippi, in violation of Mississippi Code Annotated § 97-1-1(d) (Supp. 1985). After a lengthy delay resulting from attempts to locate appellant and Rouse, the case was set for trial February 24, 1986, resulting in the conviction of appellant.
 Law I. THE LOWER COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION FOR A DIRECTED VERDICT, MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, AND MOTION FOR A NEW TRIAL. II. THE LOWER COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION FOR A CONTINUANCE. *Page 1293 
Mississippi Code Annotated § 97-1-1(d) (Supp. 1985), states the pertinent part of the conspiracy statute:
 (d) To cheat and defraud another out of property by any means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property or thing by false pretense; . . .
In James v. State, 481 So.2d 805 (Miss. 1985), the Court said:
 Since a conspiracy to commit a crime is different from the crime that is the object of the conspiracy, the first necessarily involves joint action while the other does not. By its very nature conspiracy is a joint or group offense requiring a concert of free will. The union of the minds of at least two persons is a prerequisite to the commission of the offense, or, stated differently, at least two persons must agree for a conspiracy to exist. [Moore v. State] 290 So.2d [603] at 604, [Miss. 1974]. See also Griffin v. State, 480 So.2d 1124, 1126 (Miss. 1985); Norman v. State, 381 So.2d 1024, 1028 (Miss. 1980).
481 So.2d at 808.
For an individual to be a co-conspirator, there must be a recognition on his part that he is entering into some kind of common plan, and knowingly intends to further its common purpose.Griffin v. State, 480 So.2d 1124, 1126 (Miss. 1985); McDonaldv. State, 454 So.2d 488 (Miss. 1984).
After considering all the evidence in this five-volume case most favorable to the State, which includes the detailed facts set out hereinabove, we are of the opinion that the prosecution not only made a prima facie case against the appellant, but the evidence is overwhelming as to his guilt. Therefore, assigned error I is rejected.
Appellant complains that the lower court erred in refusing to grant his motion for a continuance. On December 6, 1985, appellant appeared before the court with counsel and was arraigned. The trial date was set for February 24, 1986. On February 20, 1986, the appellant filed a motion to substitute counsel because of attorney/client differences. On February 21, 1986, the trial court permitted appellant to substitute counsel after citing the history of the proceedings since December 6, 1985. The substitution was permitted by the lower court upon the representation of Attorney Vanderburg that there would be no problem with his being ready for trial on the February 24, 1986, trial date.
We are of the opinion that the lower court did not abuse its discretion in declining to grant the motion for continuance.Gates v. State, 484 So.2d 1002 (Miss. 1986); Speagle v.State, 390 So.2d 990 (Miss. 1980); Shaw v. State,378 So.2d 631 (Miss. 1979).
The assigned error II is rejected.
 III. THE LOWER COURT ERRED IN REFUSING TO GRANT APPELLANT'S MOTION FOR A MISTRIAL MADE IN RESPONSE TO MATTERS CONCERNING "OTHER CRIMES" OR CRIMINAL ACTIVITY. IV. THE LOWER COURT ERRED IN ALLOWING CERTAIN LETTERS INTO EVIDENCE.
Appellant contends that the following answer of Deborah Jean Wilder during her direct testimony constitutes reversible error:
 Q. Have you had any contact with [Watson] lately?
 A. He's come by the office where I work, but we didn't really talk. He was just telling me he was out of jail. . . . MR. VANDERBURG: Objection, Your Honor. We object to the answer; it's not responsive; it's improper; and we move for a mistrial on the contents of the answer.
The lower court overruled appellant's objection and motion for mistrial as a result of the answer of Wilder.
In United States v. Webster, 750 F.2d 307 (5th Cir. 1984), the Fifth Circuit Court of Appeal addressed a witness's reference *Page 1294 
to the "last deal" of a defendant. The Court held that "this fleeting, unexplained reference to the `last deal' [was] obviously not reversible error." 750 F.2d at 336. See alsoUnited States v. Washam, 529 F.2d 402 (5th Cir. 1976); Andersonv. State, 285 So.2d 748 (Miss. 1973); Traxler v. State,244 Miss. 403, 142 So.2d 14 (1962).
The answer of Wilder was not responsive to the question and there was no purposeful effort or intent on the part of the State to elicit such information from the witness. Assuming arguendo that the answer constituted error, certainly it was harmless error under the facts of this case.
The assigned error III is rejected.
The assigned error IV relates to the prosecution's introduction of certain letters of complaint from credit card customers during the testimony of one William Bobbitt. Appellant argues that the admission of such letters was error in that they constituted hearsay.
William Bobbitt was the manager of the credit card department of Midland Bank Trust, Memphis, Tennessee, which was the "upstream" bank for the First National Bank of Hernando in the processing of credit card deposits. He testified that these letters of complaint, as well as the credit card charge slips themselves, were maintained as a normal course of banking procedure. A pertinent part of his testimony follows:
 Q. Would these letters of complaint that the credit card owners wrote go to the processing center in Omaha, Nebraska?
 A. They would at that time and then be forwarded to us, and we would in turn forward them to Hernando.
 Q. So, you in turn would receive from the Omaha processing center the complaints written by the credit card owners?
 A. Yes, sir.
 Q. Now, sir, during the early portion of 1983, let's say the months of March or April, did a problem arise within your bank and the First National Bank of Hernando relating to credit card charge slips deposited through a business known as Elvis, Elvis, Elvis?
 A. Yes, it did.
 Q. Explain to the jury what that problem was, sir.
 A. We began to get a great number of complaints that the tickets that had been deposited through this company and charged to the number of people's accounts were not authorized charges, charges that they stated they had not made or not authorized.
 Q. And did you actually receive these complaints from the credit card holders themselves?
 A. Through the processing center, yes.
 Q. And do you maintain these documents and records as a normal part of banking business?
 A. We do.
Rule 803(6), Mississippi Rules of Evidences, provides:
 (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
The Official Comments following Rule 803(6) states:
 It is important to note that the custodian as well as the other qualified witnesses may testify. Thus, it is not necessary to call or to account for all participants who made the record. *Page 1295 
 However, the source of the material must be an informant with knowledge who is acting in the course of the regularly conducted activity. This is exemplified by the leading case of Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930), which is still the applicable law today under the rule. That case held that a police report which contained information obtained from a bystander was inadmissible; the officer qualified as one acting in the regular course of a business, but the informant did not.
As stated, the custodian of the credit card department files testified that these letters of complaint, along with the credit card charge slips, were maintained as a normal course of banking procedure. The complaints were a natural follow-up of the credit card charge slips in determining that they were spurious. We are of the opinion that in the trial of this criminal conspiracy case the complaints were properly admitted under Rule 803(6).
The assigned error IV is rejected.
 V. THE LOWER COURT ERRED IN REFUSING TO GRANT APPELLANT'S INSTRUCTION # D-6 AND IN GRANTING THE STATE'S INSTRUCTION # S-1(C).
Instruction # S-1(C), follows:
 James Donald Watson is charged with the crime of conspiracy. If the jury finds from the evidence and beyond a reasonable doubt that James Donald Watson conspired with Deborah Jean Wilder or William Eugene Pitts or Carl B. Thompson or Howard C. Rouse to cheat and defraud the First National Bank of Hernando and/or the owners of the credit cards in order to obtain money, then the jury shall find James Donald Watson guilty of conspiracy.
 If the State of Mississippi has failed to prove any one or more of these allegations beyond a reasonable doubt, then the jury shall find James Donald Watson not guilty.
Appellant complains that the instruction "apparently led the jury to convict the appellant on a faulty factual basis." Appellant argues that the instruction "told the jury that they were to find the appellant guilty, if they found that the appellant conspired several one or more individuals including Deborah Jean Wilder, William Eugene Pitts or Carl B. Thompson."
It is obvious that the appellant misreads Instruction # S-1(C). That instruction clearly refers to Wilder, Pitts, Thompson, or
Howard C. Rouse. A conspiracy is established when the proof shows that two or more persons were involved.
Instruction D-6 follows:
 The court instructs the jury for the defendant that the jury must not consider the fact that the defendant did not testify in this case as evidence against him nor does this fact arouse even a suspicion that he is guilty, but the State must prove him guilty beyond every reasonable doubt, and to a moral certainty; and if the State has not done this, then the jury must find the defendant not guilty.
When requested, the defendant is entitled to an instruction to the effect that he did not testify was not to be considered as evidence against him. However, the court granted Instruction C-9, which substantially covers the absence of D-6. Instruction C-9 follows:
 The Court instructs the jury that the defendants at the outset of this trial are presumed to be innocent. They are not required to prove themselves innocent, or to put [on] any evidence at all upon the subject. In considering the testimony in the case, you must look at the testimony and view it in the light of that presumption which the law clothes the defendants with, that they are innocent; and it is a presumption that abides with them throughout the trial of the case until the evidence convinces each and every one of you to the contrary beyond a reasonable doubt of guilt.
We are of the opinion that when all the instructions are read and considered together, *Page 1296 
the jury was adequately and properly instructed. Woolfolk v.Tucker, 485 So.2d 1039 (Miss. 1986); McKinnon v. Batte,485 So.2d 295 (Miss. 1986); Byrd v. F-S Prestress, Inc.,464 So.2d 63 (Miss. 1985); Jackson v. Griffin, 390 So.2d 287 (Miss. 1980).
The assigned error V is rejected.
 VI. THE PROSECUTION VIOLATED RULE 4.06, UNIFORM CRIMINAL RULES OF CIRCUIT COURT PRACTICE.
Appellant contends that the State violated Rule 4.06, Uniform Criminal Rules of Circuit Court Practice, by failing to produce prior to trial a tape recording of a conversation in April, 1983, between Howard C. Rouse and bank officials. He contends that the State was allowed, over timely objection, to cross-examine Rouse about the prior tape recording. The assignment specifically involves the following occurrence at trial:
 Q. Do you remember the interview with Mr. Bush and Mr. Ussery and Mr. Taylor and the lawyer for the bank, Gary Jewel?
 A. Oh, yes. That was when they showed me the first come back slips.
 Q. I believe that was conducted in the First National Bank on April 3, 1983, about 5:30?
 A. I believe it was, sir.
 Q. And that interview, as you probably recall, was tape recorded, wasn't it?
 A. I do not know; I do not recall that.
 Q. And in that interview you told those people —
 BY MR. SCOTT: Your Honor, I'm going to object to using anything from that interview.
It is obvious from the above questions and answers that there is no indication that there was a tape recording of the interview. The record is absent any tape or any proffer as to what may have been contained in such a tape, if it existed. Rule 4.06, Uniform Criminal Rules of Circuit Court Practice, states, in pertinent part, as follows:
 The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following: . . .
 * * * * * *
 (2) copy of any recorded statements of the defendants to any law enforcement officer.
Appellant cites Hentz v. State, 489 So.2d 1386 (Miss. 1986), which does not help him in this case and on this record. Hentz
involved potentially exculpatory tape recordings of the defendant which were withheld by the State and is distinguishable from the case sub judice.
The assigned error VI is rejected.
 VII. IMPROPER REMARKS BY WITNESSES AND BY THE STATE WARRANTED A MISTRIAL. VIII. THE LOWER COURT ERRED IN SENTENCING THE APPELLANT TO A TERM OF FIVE (5) YEARS IMPRISONMENT, FINE OF $5,000 AND RESTITUTION IN THE AMOUNT OF $49,840.
We have carefully examined the assigned errors VII and VIII and are of the opinion that there is no merit in them. Therefore, it is not necessary to address these assignments.
There being no reversible errors in the trial below, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
[1] A charge back is a reversal of sale. In the case of a legitimate sale, the customer would return the merchandise to the retailer from whom he purchased it. The retailer would then issue him a refund ticket. On a charge back, in the bookkeeping phase, the amount of the credit card slip is credited back to the customer's account through a circuitous route that it has to follow. *Page 1297