ON PETITION FOR WRIT OF CERTIORARI

SULLIVAN, Presiding Justice,
for the Court:
¶ 1. Moses Dabney, III and Jason Phalo were indicted by the Hinds County Grand Jury in April 1994 for the murder of Eddie Wilson, Jr. Dabney and Phalo were tried together in September 1994, and each was convicted of murder and sentenced to life imprisonment. Dabney’s and Phalo’s appeals were assigned to the Court of Appeals, which affirmed in both cases. Dabney and Phalo separately petitioned this Court for certiora-ri, which were granted. After consideration we find that both convictions must be reversed and remanded for further proceedings.
I.
¶2. On December 31, 1993, Jason Phalo, Moses Dabney, III and two other individuals were riding around Jackson. Late that afternoon they were headed south on 1-55 west frontage road when they pulled into the parking lot of Cowboy Maloney’s Electric City. Phalo spotted a white Chevrolet Blazer in the parking lot, which he proceeded to break into with a screwdriver and steal. Phalo drove off in the Blazer followed by the car occupied by Dabney and the other two individuals. The Blazer belonged to Eddie Wilson, Jr.-, an employee of Electric City. Wilson saw his Blazer being driven away and asked a co-worker, Tye Carney, to get his car so that they could follow the Blazer.
¶ 3. Wilson and Carney followed the Blazer as it headed south on the frontage road, then turned right onto Northside Drive and headed west toward North State Street. The Blazer then stopped at the intersection of Northside and North State. At this time Moses Dabney got out of the trailing car and got into the Blazer on the passenger side. Carney pulled his vehicle in front of the Blazer to block it from going any further. Wilson got out of Carney’s car, ran to the driver’s door of the Blazer and attempted to open it. Wilson then attempted to run back to Carney’s car as shots were fired from the Blazer. Witnesses differed as to which of the occupants of the Blazer was shooting. Moses Dabney was in possession of one pistol, a .380 semiautomatic, at the time of the theft of the Blazer, and Wilson’s pistol, a .38, was also in the stolen Blazer. Jason Phalo and Moses Dabney departed the Blazer and ran from the scene. Wilson was hit in the back and died a short time later. Phalo and Dabney were tried together. Both were convicted of murder and received life sentences. Both of their appeals will be discussed in this opinion.
II. Moses Dabney, III
A.
¶ 4. One of the witnesses to the shooting stated that one of the persons in the Blazer wore a plaid shirt. Counsel for Jason Phalo introduced a plaid shirt into evidence at trial. Phalo’s counsel elicited testimony from Jackson Police Officer Clidell Conston that Conston had obtained the shirt from Jason Phalo’s mother, that Dabney had changed clothes at Phalo’s house on the day of the shooting, that Conston then discussed the shirt with Moses Dabney on January 9, 1994, and that Dabney stated that he was wearing the plaid shirt on the day of the shooting. Dabney moved to suppress the statement prior to trial, alleging that he was mildly retarded and a special education stu *735 dent, and he could not have understood his rights sufficiently to voluntarily waive them. The circuit court heard testimony concerning Dabney’s mental status from two of his teachers and a psychologist. The police officers that read Dabney his rights and took his statement also testified. The circuit court found that the State had met its burden of proof as to the voluntariness of the statements.
¶ 5. At trial only Dabney’s statement as to the plaid shirt was introduced, and this was done by Phalo. Dabney sought to introduce at trial much of the evidence that he had introduced at the pre-trial hearing on his mental capabilities. The circuit court granted the State’s motion to exclude the evidence, but stated that Dabney could call his teachers as character witnesses. Dabney was able at trial to cross-examine Officer Conston as to the circumstances surrounding the statement, including Dabney’s age, whether his parents or attorney had been called before he made the statement, and whether Conston had determined that Dabney was a special education student. Dabney called at trial as character witnesses the same two teachers who had testified earlier in the pre-trial hearing on admissibility. These witnesses identified themselves during their testimony as special education teachers or teachers of ex-' ceptional students.
¶ 6. Dabney cites Cole v. State, 525 So.2d 365, 368 (Miss.1987), which states that once
the trial court has admitted a confession into evidence, it is still within the province of the jury to determine whether the statement is true and voluntary, and what weight and credibility should be accorded to it. Wilson v. State, 451 So.2d 724 (Miss.1984); Rhone v. State, 254 So.2d 750 (Miss. 1971). Thus, once a confession has been admitted, “either party has a right to introduce before the jury the same evidence which was submitted [at the suppression hearing] as well as any other evidence relative to the weight and credibility of the confession.” Rhone, 254 So.2d at 754.
This Court found in Cole that defense counsel was able to substantially make his argument concerning the confession before the jury and there was no reversible error.
¶ 7. The State argued before the Court of Appeals that the statement in question was never taken up in the pre-trial suppression hearing and that evidence of Dabney’s mental state was irrelevant. A review of the record contradicts this. We find that Dab-ney was improperly restricted in his attempt to demonstrate that the jury should accord little weight or credibility to his statement because of his mild retardation. This is not to say that all the evidence which Dabney introduced at his pre-trial suppression hearing is automatically admissible at trial. We recognize that as to the admission of evidence, a pre-trial hearing will often be a more relaxed setting than a trial. While the rule in Cole is controlling here, the restrictions found in the Rules of Evidence also apply to any evidence which Dabney may attempt to introduce at trial, including the evidence in question here.
B.
¶ 8. Dabney requested instruction DD-6, which was refused based on the objection of Phalo, Dabney’s co-defendant:
The Court instructs the Jury that the law does not compel the defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be drawn from the failure of the defendant to testify.
Dabney cites Funches v. State, 125 Miss. 140, 87 So. 487 (1921), in support of his argument that refusal of DD-6 was reversible error. This Court stated in Funches that refusal of such an instruction was not always reversible error, and could be harmless. An additional reason for reversal in Funches was that the State commented on Funches’s failure to testify. There is no allegation of that in this case.
¶ 9. In this case the trial court’s instruction, C-4, was granted. It stated:
The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving a Defendant guilty of every material element of the crime with which he is charged. Before you can return a verdict of guilty, the *736 State must prove to your satisfaction beyond a reasonable doubt that a Defendant is guilty. The presumption of innocence attends the Defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the Jury of his guilt beyond a reasonable doubt. The Defendant is not required to prove his innocence.
¶ 10. The Court of Appeals relied on Watson v. State, 521 So.2d 1290 (Miss.1988), where this Court dealt with the refusal of a similar instruction. This Court found in Watson that the trial court’s instruction “substantially cover[ed] the absence” of the defendant’s proposed instruction. Watson, 521 So.2d at 1295. The Court of Appeals found that Instruction C-4 performed the same function in this case. C-4 is substantially similar to the instruction in question in Watson; the primary difference is that, in Watson, in addition to the language stating that the defendant is not required to prove his innocence, the Watson instruction added “or to put [on] any evidence at all upon the subject.” Watson, 521 So.2d at 1295. We find that the omission of this language from instruction DD-6 did not amount to reversible error.
III. Jason Phalo
A.
¶ 11. Moses Dabney made two statements to members of the Jackson Police Department, on January 5 and 10, 1994. In the January 5 statement Dabney stated that he fired his pistol during the confrontation with Wilson, but that Phalo had hollered at him at the time, “Shoot that n-, shoot that n-.” Dabney said that he fired perhaps twice, then paused, and then started shooting again. In the January 10 statement Dabney stated that both he and Jason Phalo fired the .380 pistol and that Dabney also fired Wilson’s .38 pistol in the air while he was getting out of the Blazer and running. Counsel for Phalo attempted to introduce only that part of the January 5 statement, through the police officer who had taken the statement, that Dabney had been the shooter. The circuit court ruled the evidence inadmissible. Phalo argues here that the evidence was admissible under the hearsay exception of M.R.E. 804(b)(3), a statement against interest. Rule 804(b)(3) states:
(b) Hearsay Exceptions-. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant’s pecuniary or proprietary interest, or so far tended to subject him to civil or .criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
The Court of Appeals found that Dabney was unavailable, as he did not testify. It next found that the statement also qualified as one a reasonable man would not have made unless he believed it to be true. Last, it cited pre-Rules of Evidence cases in affirming.
¶ 12. Jason Phalo relies on Lacy v. State, 700 So.2d 602 (Miss.1997), decided two days after the Court of Appeals affirmed Phalo’s conviction. Phalo particularly quotes from Lacy, 700 So.2d at 607, concerning whether a “reasonable person [would] believe that the statement might have been made in good faith.” Also to be considered are the circumstances surrounding the making of the statement and the notion that no reasonable person would'make such a statement if it were not true.
¶ 13. In Williams v. State, 667 So.2d 15 (Miss.1996), this Court considered whether the circuit court had erred in admitting the statement of Chelsea Williams, the wife of the appellant. Chelsea’s statement was that the appellant, who had just shot one Mr. Richardson, placed Richardson in the trunk of his car while Richardson was still alive. The appellant subsequently dumped Richardson’s body at a garbage dump. Chelsea’s statement further alleged that the appellant considered returning to the dump and shooting Richardson again to make sure he was dead. The circuit court found that the re *737 quirements of M.R.E. 804(b)(3) were met and admitted the statement. This Court found that after consideration of the “statement for its content and in the context in which it was given, it is clear that this statement was not such that she believed it would have subjected her to criminal liability.” Williams, 667 So.2d at 20. This Court found particularly relevant certain factors: declarations against penal interest which inculpate others are generally considered unreliable and untrustworthy; and a close examination of all the circumstances surrounding the making of the statement is required, such as a custodial confession given under potentially coercive circumstances. In this ease Phalo attempted to introduce part of Dabney’s statement, which would incriminate Dabney, who made the statement as a result of custodial interrogation. The evidence appears uncontradiet-ed that Dabney is mildly retarded and is a special education student. We also consider Dabney’s second statement, which is potentially incriminating to Phalo as well as Dab-ney, but is inconsistent with the first statement.
¶ 14. This Court also noted in Williams that even if a statement appears admissible under 804(b)(3), it must also pass muster under the Confrontation Clause. However, in Lacy, 700 So.2d at 607-08, this Court found that the Confrontation Clause was not implicated where the defendant offered the statement of the declarant which incriminated the declarant and not the defendant.
¶ 15. We find that the circuit court did not err in excluding that portion of the January 5 statement offered by Jason Phalo. If the January 5 statement, or the portion of the statement in question, were admitted, then the rest of this statement, and the January 10 statement, would also be admissible. If there was error in excluding the evidence, it was harmless.
B.
¶ 16. Phalo argues that the circuit court erred in refusing instruction D-3:
If you find from the evidence beyond a reasonable doubt that: 1) Jason Phalo did, on December 31, 1993 in Hinds County, Mississippi; 2) By act, procurement of [sic] culpable negligence; 3) Kill Eddie Wilson, Jr.; 4) While Jason Phalo was committing the crime of Grand Larceny or Auto Theft, then you may find Jason Phalo guilty of the crime of manslaughter.
The Court of Appeals found that the evidence did not support the giving of this instruction. Under Fairchild v. State, 459 So.2d 793 (Miss.1984), if there was evidence to warrant the giving of the lesser included offense instruction, then it should have been given, even if the greater weight of the evidence supported the greater offense.
¶ 17. A review of the record shows that Jason Phalo is 6’3”; Moses Dabney is 5’6”. Jason Phalo was the driver of the stolen Blazer; Moses Dabney got into the Blazer as passenger when it stopped at the intersection of Northside and North State.
¶ 18. In this case Jewel Davis, one of the witnesses at the intersection that day, heard gunfire and saw a young man standing by the passenger side of the door of the Blazer aiming a pistol across its hood. Davis said that the person aiming was a young black male, shorter and with a lighter complexion than the other male in the Blazer. She saw this person aiming but did not see him firing shots. After the shooting she saw this person running away with the gun down by his side. She thought she saw the second, taller person with a gun in his hand as he was running away but she wasn’t sure.
¶ 19. Clara Davis, daughter-in-law of Jewel Davis and a witness at the intersection, saw a person from the passenger’s side of the car standing up with a gun in his hand shooting between the opening of the car door. She then saw this person running away with a gun in his hand. She though he was wearing a plaid shirt or jacket. She identified the passenger as the taller of the two. She could not give any description of the second person she saw running away with the person with the gun. Davis later reviewed a statement she had given police and stated that she felt that one of the suspects was taller than the other, but she could not say whether either of these persons had been the passenger/shooter. She then said that she believed *738 the taller of the two still carried a gun as they ran away.
¶ 20. Arthur Davis, son of Jewel and husband of Clara, was also at the intersection at the time of the shooting but was in a different vehicle than that of his wife and mother. Davis saw a shooter from the passenger side of the Blazer who appeared to be black. He also saw the driver of the Blazer, who was a black male. Davis heard two quick bursts of gunfire, then a pause, then three to four shots. Davis saw one person running from the Blazer but didn’t know whether it was the passenger or the driver. Davis never saw any shots come from anywhere but the passenger side of the Blazer.
¶ 21. Mamie Hardges was in the ear directly behind the stolen Blazer when the shooting began at the intersection. Immediately before the shooting she saw a short, light-complected black male get out of another ear and get in the passenger side of the Blazer. Once the shooting started she saw a black male get out of the driver’s door of the Blazer. She stated that he was shooting at Eddie Wilson as he was getting out of the door. She said that the driver of the Blazer was the taller of the two. She then saw the driver of the Blazer, still with the gun in his hand, run away. She thought that the tall male was wearing a plaid shirt, but she wasn’t sure. Later she stated that she probably didn’t see the driver firing at Wilson.
¶ 22. Jackson Police Officer Todd King arrived at the intersection shortly after the shooting. He then searched the area for the suspects, and eventually saw two black males running from the scene, but they were too far away for him to catch. King stated that one suspect was noticeably taller than the other, and was wearing black pants and a black shirt. The shorter suspect was wearing a brown plaid shirt and light-colored jeans.
¶ 23. Curtis Rhone accompanied Jason Phalo and Moses Dabney as they rode around Jackson the day of the shooting. Rhone was in the ear behind the Blazer at the intersection of Northside and North State when Eddie Wilson tried to block the Blazer. Rhone stated that Wilson came to the driver’s side door of the Blazer, trying to open the door; that Jason Phalo started to kick the door from the inside; that a shot was fired, and Wilson tried to run away; that Jason Phalo got out of the truck and began to run; and that Moses Dabney began to shoot from the passenger side. After that both Dabney and Phalo ran away.
¶ 24. Phalo argues that he was entitled to Instruction D-3 under the definition of manslaughter provided in Miss. Code Ann. § 97-3-27 (1994):
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.
¶ 25. Phalo argues that most if not all the evidence points to Moses Dabney as the shooter. We find that under these circumstances Phalo was entitled to a manslaughter instruction. The instruction as proposed by Phalo did not contain the element “without malice.” This is a critical element of the law as provided in § 97-3-27. This Court stated in Manuel v. State, 667 So.2d 590, 593 (Miss.1995):
In homicide cases, the trial court should instruct the jury about a defendant’s theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely, and the trial court’s failure to do so is error requiring reversal of a judgment of conviction. Hester, 602 So.2d at 872. Where the instructions are in improper form and are the only ones embodying a legally correct theory of the defendant’s defense, it is the duty of the trial court to see that the instructions are placed in proper form for submission to the jury. Id. at 873.
The failure to submit Instruction D-3, in corrected form, amounts to reversible error.
¶ 26. Phalo makes the same argument concerning the denial of Instruction D-4, concerning the offense of accessory after the fact, which states:
*739 If you are convinced from the evidence beyond a reasonable doubt that: 1) Jason Phalo did, on December 31, 1993 and/or thereafter, in Hinds County, Mississippi; 2) Conceal, receive, relieve, aid or assist Moses Dabney in escaping or avoiding arrest, trial, conviction or punishment; 3) At a time when Jason Phalo knew that Moses Dabney had committed a felony; then you may find Jason Phalo guilty of Accessory After the Fact of a Felony.
¶ 27. Phalo cites Gangl v. State, 539 So.2d 132 (Miss.1989), where this Court found that the circuit court had erred in not granting an accessory after the fact instruction where the principal charge was robbery. Gangl did not participate in the robbery itself but drove the alleged getaway car. The question was whether Gangl was an accessory before or after the fact. This Court in Gangl stated that the standard for granting a lesser offense instruction was the same as that of granting a lesser included offense instruction.
¶ 28. In this case the evidence shows that Phalo and Dabney both ran back to Phalo’s house after the shooting. During this time Dabney threw one of the guns away. Dab-ney changed clothes at Phalo’s house. Phalo drove Dabney home. On January 5 Phalo gave police a statement and led them to one of the pistols, the .380. Marcus Nelson, a friend of Dabney’s, stated that he, at Dab-ney’s request, moved the .38 from one hidden location to another. Nelson eventually gave the gun to a friend, but also called police, and it was recovered. We find that the evidence is insufficient to support Instruction D-4.

CONCLUSION

¶ 29. The circuit court erred when it excluded at trial evidence of Moses Dabney’s mental condition as it possibly pertained to the credibility of his statements to the police. Further, the circuit court erred when it refused to grant a manslaughter instruction for Jason Phalo. Dabney’s and Phalo’s convictions and sentences are reversed and remanded to the circuit court.
¶ 30. REVERSED AND REMANDED.
PRATHER, C.J., PITTMAN, P.J., and BANKS, McRAE and MILLS, JJ., concur.
SMITH, J., dissents with separate written opinion joined in part by JAMES L. ROBERTS, Jr., J.
WALLER, J., not participating.