# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-CC-00337-SCT

*MISSISSIPPI GAMING COMMISSION, CDS SERVICE COMPANY, CDS GAMING COMPANY AND CASINO DATA SYSTEMS*

*v.*

*EFFIE FREEMAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/1998 |
| TRIAL JUDGE: | HON. JOHN LESLIE HATCHER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: R. STEWART SMITH, JR. |
| ATTORNEYS FOR APPELLEE: | SAMUEL L. BEGLEY |
| | JOHN F. HAWKINS |
| | D. BRIGGS SMITH, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 06/17/1999 |
| MOTION FOR REHEARING FILED: | 7/1/99; denied 10/28/99 |
| MANDATE ISSUED: | 11/04/99 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Convinced that she had all three of her Cool Millions ducks in a row on the pay line of her slot machine, Appellee Effie Freeman claimed to have won the Cool Millions primary progressive slot machine jackpot at Splash Casino in Tunica County, Mississippi, on April 8, 1995. However, after investigation and an evidentiary hearing before a hearing examiner, the Mississippi Gaming Commission adopted the examiner's findings and conclusions and ruled that Freeman had not won the jackpot. Freeman appealed to the Circuit Court of Tunica County which reversed the Commission's decision because it concluded that the decision was not supported by substantial evidence and because the procedures followed in resolving this casino patron dispute violated Freeman's rights to due process of law. We reverse and render the circuit court's judgment, and we reinstate the Commission's decision.

## STATEMENT OF THE CASE

### A. Statement of the Facts

¶2. On April 8, 1995, Appellee Effie Freeman went to Splash Casino in Tunica County to gamble and, while at the casino, played a "Cool Millions" slot machine, designated No. 5638 by Splash Casino. "Cool Millions" is a progressive slot system owned and operated by Appellant Casino Data Systems ("CDS") Gaming Company. "Cool Millions" allows slot machines located at various casinos in Mississippi to contribute to, and compete for, a common multimillion dollar jackpot award. Appellant Mississippi Gaming Commission (the "Commission") has licensed CDS and approved of the "Cool Millions" game.

¶3. Cool Millions operates through a three reel, three coin dollar slot machine manufactured by Sigma. The game provides a minimum top jackpot award of one million dollars. CDS will pay one million dollars of the jackpot immediately, with the balance paid in the form of an annuity. The primary progressive jackpot is hit when, after the patron inserts three coins and spins three reels, the three designated symbols (the Cool Millions ducks) line up on the pay line.

¶4. The facts are in dispute from this point.

## 1. Freeman's Account of the Events of April 8, 1995

¶5. At the trial hearing before the Commission, Hearing Examiner Larry Stroud heard Freeman's claim that she placed three coins in the Cool Millions slot machine. Freeman said she had been playing for fifteen minutes, playing three coins the entire time, when three symbols lined up on the pay line in red, white and blue order, and the machine registered a jackpot. According to Freeman, the lights and bells went off, the front of the slot machine showed three coins in, and it showed three coins in the display. Freeman further testified that the "big number" that flashes on top "just stopped. Like they normally run on the machine, it didn't run anymore." Shortly thereafter, a Splash slot attendant, Ms. Sandra Garner,[1] arrived and opened the machine and paid her $5.00 in tokens, which Freeman says were drawn from the hopper of the slot machine and not poured into the payout tray of machine automatically.

¶6. Freeman alleged that Garner moved something and removed one of the symbols from the pay line. To bolster her claims, Freeman presented the testimony of witnesses, all four of whom were her friends who had accompanied her to Splash Casino. None of the friends testified as to the number of coins played into the machine, and only one, Jackie Yarbrough, claimed to see three Cool Millions symbols in red, white and blue order and heard the bells ringing. Another, Lisa Curry, arrived at the same time as Garner, and she saw three ducks and the lights on top of the machine flashing.

¶7. Freeman also testified that a Splash Casino employee, Edna Erwin,[2] told her that she had won the jackpot. However, another of Freeman's friends who was present, Della Miller, testified that Erwin told her that Freeman had not hit the jackpot, but that the slot machine had jammed.

### a. Sinks's Testimony

¶8. Finally, Freeman presented the expert testimony of John Sinks, an electronics engineer with a B.S. degree in electronics engineering from the University of Maryland as well as a former employee of Harrah's Casino with six months experience in gaming. He testified that, by using a magnifying glass while reviewing the surveillance tape, he could see Garner move the middle reel to remove the Cool Millions symbol from the pay line. According to Sinks, the computer printouts from CDS and Splash Casino were inconsistent and unreliable.

¶9. Sinks further stated that he had never witnessed a Cool Millions machine hit a progressive jackpot, but

he had witnessed two smaller jackpots on a Cool Millions game. On one of those jackpots one light flashed on top and on the other jackpot both lights flashed. Sinks indicated that Freeman's experience would be consistent with a primary progressive jackpot, because of the bells ringing and the lights flashing and due to the fact that the slot machine had stopped incrementing and scrolling.

## 2. The Investigating Agent's Testimony

¶10. In contrast, Commission Agent John Gorman, who investigated Freeman's claim, testified that he obtained and reviewed surveillance tapes of the incident from Splash Casino. Further, he reviewed the written statement of Sandra Garner, the machine's MEAL (machine entry access log) card, and the casino's slot data systems (SDS) computer report showing the activity on Freeman's slot machine at the time in question. Gorman testified that the tapes reveal the slot machine with the top light flashing (a signal that the machine is in tilt mode) and then Garner opening the machine and correcting the tilt.

### a. Garner's Written Statement

¶11. Garner's written statement that Gorman reviewed read as follows:

> There were a customer dispute on Saturday 4/8/95 at 4:55 p.m. on cool million machine #5638. I heard the bell ringing on cool million when I went to the machine it had one coin bet and was flashing hopper empty and the winning symbols were 1 cool million on the line one above the line and 1 cool million on the line.

> I went into the machine and the coins were jam tight so I had to move the coins around so that they could have room to pay out of hopper.

> The customer were starting to scream, I told her that it was only a jam, but she kept telling the other customers who were standing around that she had hit the cool millions. After the jam were clear, I told the customer that the machine would pay out her five coins and it did.

> The customer wasn't pleased she said she hit the cool million. I explain to her what she had won, the machine reads any two cool million or two cherry on pay line with 1 coin bet wins $5.00's.

> She later talked to Mr. Bud Flemmon.

> /s/ Sandra Garner

The computer printout verified Garner's statement to Gorman-showing that when she opened the door to correct the tilt, only one coin had been played.

¶12. Finally, Gorman testified that if the Cool Millions primary progressive jackpot been won, the slot machine would have locked up; that no one at Splash Casino could have reset the jackpot and that only a CDS representative could reset it; that the machine would have sent a signal to CDS that there was a jackpot; and that the two lights on top of the machine would have been illuminated but not flashing. Gorman testified that none of these occurred. Gorman testified that the machine's light was blinking, indicating it was in tilt mode. Gorman also stated that the tape shows Freeman playing the machine with one coin after Garner unclogged the machine. Therefore, Gorman's opinion was that Freeman had not won the primary progressive jackpot.

### 3. Casino Data System's Case

¶13. CDS presented testimony from former Splash Casino employees, JoAnn Jernigan, Surveillance Supervisor, and Bud Flemmons, Co-Slot Manager, as well as CDS employees Gary Mitchell, Multi-Site Progressive Supervisor, and Willie Orr, Technical Supervisor.

#### a. Jernigan's Testimony

¶14. Jernigan testified that she was on duty at the time of Freeman's alleged jackpot, and pulled up a close-up view when saw the crowd gather around Freeman. She testified that she knew that the primary progressive jackpot had not been won, because the meter board on top of the machine, # 5638, had not changed to show there was a winner as it should do when a jackpot is hit. Jernigan noted that the light on top of Freeman's machine indicated a hopper jam, not a jackpot.

¶15. Jernigan then went down to the casino floor to talk to Garner. Garner told her that the patron, Freeman, had thought she had won, but that she had neither played three coins nor lined up all three symbols, but instead had won the $5.00 award. Despite believing Freeman was satisfied, Jernigan had Garner complete a written report, the one given to Agent Gorman above, and go over it with her. Jernigan testified to being concerned that Freeman's friends might try to influence her into disputing the hopper jam at a later date.

¶16. Jernigan then identified the three surveillance tapes she had given Agent Gorman (Ex. 3-5). Exhibit 4 shows Freeman as she begins playing the slot machine. At exactly 5:00 p.m., the alleged winning play occurred, but it is not on video because of a routine tape change.[3] Exhibit 5 was the first tape after the 5:00 p.m. tape change on April 8, 1995. Jernigan showed the court that at 17:01 (5:01 p.m.) on the tape the light on Freeman's slot machine was indicating a problem, usually either a coin jam or it needed a hopper fill. Garner approached the machine at 17:03 and after inserting her employee card, pulled out the machine MEAL card and initialed it at 17:04. While explaining the situation to Freeman, Garner attempted to close the door, but had to reopen it and shuffle the coins around with her hand. At 17:05, Garner secured the door and then pointed to the pay table on the bottom of the machine. At 17:06, Garner left, and Freeman began playing the machine again. At 17:10, Garner returned to the machine to again explain to Freeman what the payout was.

¶17. Jernigan also identified the SDS computer report which Agent Gorman had previously reviewed. The SDS report showed the slot machine door opening at 16:51.[4] Jernigan testified that the report showed that Freeman's machine had a "hopper can't pay" status which means hopper jam. According to Jernigan, the report also showed that the last play on the machine was a one coin play and that no one played the machine when Garner entered it.

¶18. On cross-examination, Jernigan stated that Splash Casino would not be paying for a jackpot on the Cool Millions game, but the money would come from a pool provided by CDS and the patrons who have played it; that if a jackpot had been won, it would have shown a jackpot on the surveillance tapes and on the SDS computer report; and that when a jackpot hits, the first thing she does is call a gaming agent to verify the jackpot.

#### b. Flemmons's Testimony

¶19. Flemmons testified that the slot machine pays out after a hopper tilt is cleared as in Freeman's situation.

He stated that the SDS computer report showed that there was a hopper jam, an employee entered the machine, the door opened, then the door closed, and finally five coins were dropped into the tray. Further, upon cross-examination, Flemmons stated that it is impossible to have a progressive jackpot followed by a hopper failure, because the machine will not permit anything else to happen until the jackpot is paid and the machine is reset. Moreover, he stated that a slot machine reel could be moved, but that it would not impact a jackpot once it had been triggered. Once the computer has selected the pay line combination, physically adjusting the reel would not alter the outcome. Finally, he stated that the computer report is totally in agreement with Garner's written report.

### c. Mitchell's Testimony

¶20. CDS employee Gary Mitchell was in charge of monitoring the computers which track all of the Cool Millions slot machines in Mississippi. According to Mitchell, the CDS Transaction Logs (computer reports generated by CDS system) record every jackpot greater than $400, because the Cool Millions system was programmed so that every jackpot of $400 or more had to be paid by hand. The CDS computer showed that Freeman's slot machine was in a hopper tilt, that there was a slot open by the casino employee entering the machine; that the door was closed but the problem remained; that the door was reopened and then closed; and that play then began again.

¶21. According to Mitchell, if there had been a primary progressive jackpot, the reports would have indicated a jackpot on the both the CDS monitors and on the CDS computers. The CDS computer screen would have turned bright red, and CDS would have to verify the jackpot at the site. Mitchell further testified that CDS would have no motive to deny a legitimate jackpot, because the money to pay out had already been set aside and having a winner would bring positive publicity for their games. Furthermore, Mitchell stated that had a jackpot hit, the word "jackpot" would have appeared in the coin-in display, the meters would have reset to the base amount, and every fifteen minutes the Cool Millions meters in every Mississippi casino would have displayed the winning machine's number and the dollar amount won.

¶22. During cross-examination, Mitchell asserted that the computer system was on-line 24 hours a day, and that if the system were to fail, the information would still be reported by a back-up system. The system had previously been tested for two months at four different sites, and before installation, an independent testing agency, Gaming Labs International, had also tested the system.

### d. Orr's Testimony

¶23. CDS employee Willie Orr had installed or supervised the installation of every Cool Millions game in Mississippi. Orr was in charge of assembling, testing, and maintaining all of the games as well as the monitoring systems. He was accepted as an expert in the operations of Cool Millions games.

¶24. Orr testified as to the differences in reactions of the slot machine in the event of a jackpot or a hopper tilt-reactions of machine # 5638 (evidenced by surveillance tapes and Freeman's testimony) are in bold--as follows:

| Jackpot Characteristics | Hopper Tilt Characteristics |
| --- | --- |
| 1. both candles on top of the machine illuminate but do not flash | **Top candle alone flashes** |
| 2. Casino and CDS computer reports both indicate jackpot. | **Neither indicates jackpot** |
| 3. Casino SDS report prints out "Jackpot" | **SDS report prints out "Hopper Can't Pay"** |
| 4. CDS Transaction Log prints out "Group 0 Jackpot" | **CDS Transaction Log prints out "Hopper Tilt"** |
| 5. CDS headquarters computer screens turn bright red | **Screens show the machine number and "Hopper Tilt."** |
| 6. Every fifteen minutes the meters at the top of every Cool Millions machine in Mississippi turn a solid red and exhibit the words "Machine 5638" and the amount won. | **Meters continue to increment in flashing multiple colors** |
| 7. The Progressive amount resets to One Million and then begins to increment. | **Amount continues to increment** |
| **8. The machine bell rings.** | **The machine bell rings.** |
| 9. LED display on the face of the slot machine reads "Jackpot." | **LED display reads the number of coins played.** |
| 10. CDS personnel are notified in order to verify. | **Casino personnel are summoned to unjam the hopper.** |
| 11. The Commission is notified by the casino to assist in jackpot verification. | **The Commission is not notified.** |

¶25. Orr reviewed the surveillance tapes and determined that Freeman was only playing one coin into machine # 5638 when it went into a hopper tilt evidenced by the top tower light flashing. Further, the progressive numbers on the meters were changing colors as they do when normally incrementing. Orr testified that a hopper tilt is often caused by the coins being jammed too tight, and to remedy the tilt, someone must stir the coins until unjammed, as Garner said she did here. Orr also stated that, if Garner had changed the reel as Freeman alleges, it would not have changed a valid jackpot because the computer signals would have already been triggered.

¶26. Finally, Orr presented the hearing examiner with a video demonstration of how the Cool Millions game performs when it goes into a hopper tilt. The demonstration showed the top candle of the machine flashing and a loud noise being emitted. Orr also provided the hearing examiner with a portion of the machine's manual showing the tower lamp indicators for the machine that Freeman was playing. The tower lamp indicator for a hopper tilt is the top light flashing; whereas, the jackpot indicator is both lamps illuminated but not flashing. According to Orr's review of the surveillance tapes, only the top candle of Freeman's machine (#5638) was illuminated, and it was flashing. Orr finished his testimony by stating that it was clear to him that machine #5638 went into a hopper tilt when Freeman was playing it.

## B. The Proceedings Below

¶27. Freeman claims to have won the Cool Millions primary progressive slot machine jackpot at Splash Casino in Tunica, Mississippi, on April 8, 1995. On June 6, 1995, Freeman's attorney notified the

Commission of Freeman's claim. Pursuant to Miss. Code Ann. § 75-76-159 (1991), the Executive Director of the Commission appointed agent Gorman to investigate the claim. On June 20, 1995, agent Gorman found in favor of Splash Casino and CDS.

¶28. On July 6, 1995, Freeman timely requested a hearing to reconsider. Splash Casino was no longer in business and was not made a defendant. The Commission assigned the case to Hearing Examiner Larry Stroud who, on January 11 and 12, 1996, conducted a hearing in which testimony and evidence were taken. On February 27, 1996, the Hearing Examiner issued his decision in favor of CDS and found the following facts:

> "1. On April 8, 1995, Effie Freeman was playing the Cool Millions Slot Machine 5638 at Splash Casino in Tunica, Mississippi.
>
> 2. Sometime near 5:00 p.m. Freeman placed a one dollar token into the machine or wagered one credit and played the machine.
>
> 3. The reels spun and resulted in two ducks, winning symbols, to line up on the payline, with the third duck visible on the reel but not on the payline.
>
> 4. The above combination with one coin in results in an award of five dollars, which is to be paid by the hopper of the machine.
>
> 5. No report of a jackpot was sent to either the SDS local computer or to CDS's master computer in Gulfport.
>
> 6. Instead, the slot machine reported to SDS a "hopper can't pay" and to CDS a "hopper tilt."
>
> 7. The machine locked up, the top section of candle light on the top of the slot machine illuminated and noise maker went off.
>
> 8. This activity is more consistent with a hopper problem than a jackpot.
>
> 9. A slot technician, Sandra Garner, appeared in approximately three minutes and began to work on the machine.
>
> 10. The hopper jam was cleared and the machine was reset, although Ms. Garner had to reopen the machine to reset it.
>
> 11. Ms. Freeman was paid her five dollars.
>
> 12. Freeman renewed her play of the machine."

The legal conclusion reached by the Hearing Examiner was that the substantial weight of the evidence supported a finding that Freeman did not win a primary progressive jackpot.

¶29. On March 11, 1996, Freeman appealed the Hearing Examiner's decision to the Commission. On March 21, 1996, the Commission met to consider Freeman's petition to reconsider the hearing examiner's decision. At the meeting, the Commission adopted the Hearing Examiner's findings as its Final Decision.

¶30. On April 8, 1996, Freeman appealed the Commission's decision to the Circuit Court of Tunica

County, Mississippi. The circuit court reversed the Commission's decision and entered a judgment in favor of Freeman on January 20, 1998. In its Opinion, the circuit court reviewed "the voluminous record" and found that (1) "the substantial rights of the Petitioner (Freeman) have been prejudiced because the Commission's decision is not supported by substantial evidence" and (2) Freeman's due process rights had been infringed by the casino patron dispute process. On February 5, 1998, the circuit court entered an Amended Judgment reaffirming its previous judgment and opinion and calculating interest due and owing to Freeman. On February 13, 1998, the circuit court denied CDS's motion to alter or amend the judgment.

¶31. Aggrieved, CDS filed a timely and proper appeal to this Court on February 26, 1998, and the Commission soon joined with its notice of appeal on March 5, 1998. CDS and the Commission raise the following contentions on appeal:

**I. DID THE CIRCUIT COURT ERR IN CONCLUDING THERE WERE NO FACTS CONTAINED WITHIN THE RECORD UPON WHICH TO BASE A FINDING THAT EFFIE FREEMAN DID NOT WIN A PRIMARY PROGRESSIVE JACKPOT.**

**II. DID THE CIRCUIT COURT ERR IN CONCLUDING THAT THE PATRON DISPUTE PROCESS DENIED EFFIE FREEMAN DUE PROCESS OF LAW.**

### STANDARD OF REVIEW

¶32. A right of appeal is statutory, and a circuit court has no authority to judicially create a right of appeal from an administrative agency in the absence of clear statutory authority therefor. ***Bickham v. Department of Mental Health***, 592 So.2d 96, 97-98 (Miss. 1991). Additionally, the Court must adhere to its deferential standard of review of the findings of an administrative agency which the Legislature codified in Miss. Code Ann. § 75-76-171. *See **Casino Magic Corp. v. Ladner***, 666 So.2d 452 (Miss. 1995).

¶33. Miss. Code Ann. § 75-76-171(3) (1991) states, as follows:

(3) The reviewing court may affirm the decision and order of the commission, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:

(a) In violation of constitutional provisions;

(b) In excess of the statutory authority or jurisdiction of the commission;

(c) Made upon unlawful procedure;

(d) Unsupported by **any evidence**; or

(e) Arbitrary or capricious or otherwise not in accordance with law.

*Id.* (emphasis added). Finally, Miss. Code Ann. § 75-76-173(2) (1991) states that judicial review as provided in this chapter is the exclusive method of review of the commission's actions. *Id.*

### LEGAL ANALYSIS

**Casino Patron Disputes**

¶34. The Mississippi Gaming Control Act , Miss. Code Ann. §§ 75-76-1 *et seq.* (1991 & Supp. 1998), passed by the Legislature in 1990, legalizes and regulates casino gambling in certain Mississippi counties. The Act creates a three-member gaming commission. Miss. Code Ann. § 75-76-15 (1991). The executive director hires and supervises a staff of enforcement agents and investigators. Miss. Code Ann. § 75-76-17 (1991).

¶35. The Act establishes a procedure for resolving disputes between a casino patron and a gaming licensee. In those instances where the dispute involves $500 or more, the casino is required to immediately notify the executive director of the commission. Miss. Code Ann. § 75-76-159 (1991). The executive director "shall conduct whatever investigation is deemed necessary and determine whether payment should be made." ***Id.*** Either the patron or the licensee may then file a petition with the commission requesting a hearing to reconsider the executive director's decision. Miss. Code Ann. § 75-76-161 (1991). The commission, in turn, appoints a hearing examiner to conduct a hearing on the patron dispute. Miss. Code Ann. § 75-76-161 (1991). The party seeking reconsideration bears the burden of showing that the executive director's decision should be reversed or modified. ***Id.***

¶36. The Commission regulations concerning player disputes provide for the parties to present evidence and to call and examine witnesses and to cross-examine opposing witnesses. Mississippi Gaming Regulation III.H Section 5. Any person aggrieved by the Hearing Examiner's decision may seek a hearing with the Commission to reconsider the ruling. Miss. Code Ann. §§ 75-76-119 & -161 (1991). However, the Commission may decide to adopt the Hearing Examiner's decision as the final order of the Commission. ***Id.***

¶37. The final decision of the Commission may be appealed by filing a petition for judicial review in the circuit court of the county in which the dispute between the gaming licensee and the patron arose. Miss. Code Ann. § 75-76-167 (1991). The review by the circuit court is conducted without a jury and must not be tried *de novo* but is confined to the record on review. Miss. Code Ann. § 75-76-171 (1991).

¶38. As an initial matter, this Court must decide the proper standard of review in casino patron disputes. CDS asserts that the circuit court applied an improper standard, the substantial evidence standard. CDS contends that the proper standard of review for a determination by the Commission is determined by the controlling statute-The Mississippi Gaming Control Act, Miss. Code Ann. §§ 75-76-1 *et seq.* (1991 & Supp. 1998), which creates an unsupported by **any** evidence standard of review, ***id.*** § 75-76-171(3)(d).

¶39. In contrast, Freeman argues that the circuit court in the instant case applied the correct standard of review when it said, as follows:

> A decision of an administrative agency must be overturned if it is not supported by substantial evidence. ***Montalvo, M.D. v. Mississippi State Bd. of Medical Licensure***, 1996 WL 11016 (Miss.); ***Nelson v. State Bd. of Veterinary Medicine***, 662 So.2d 1063 (Miss. 1995). In ***Miss. Dept. of Environmental Quality v. Weems***, 653 So.2d 266, 273 (Miss.1995), this Court stated that:
>
> [O]ur Constitution does not permit the judiciary of this state to retry de novo matters on appeal from administrative agencies. Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law. When an administrative agency has performed its function, and has made the determination and entered the order required of it, the parties may then appeal to the judicial tribunal

to the hear the appeal. *The appeal is a limited one ... since the courts cannot enter the field of administrative agency. The court will entertain the appeal to determine whether or not the order of the administrative agency (1) was supported by substantial evidence, (2) was arbitrary and capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party.*

See *State Tax Comm'n v. Earnest*, 627 So.2d 313, 319 (Miss.1993) (emphasis in original).

¶40. In *Casino Magic*, this Court was faced with the question of whether the Gaming Control Act provided a right to appeal a denial of a preliminary site approval. 666 So.2d at 456. In holding that there was no such right, this Court analyzed a number of statutory provisions of the Act including Miss. Code Ann. § 75-76-125, which reads in pertinent part:

....

(2) The review must be conducted by the court sitting without a jury, and must not be a trial de novo but is confined to the record on review.

(3) The reviewing court may affirm the decision and the order of the commission, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:

(a) In violation of constitutional provisions;

(b) In excess of the statutory authority or jurisdiction of the commission;

(c) Made upon unlawful procedure;

(d) Unsupported by any evidence; or

(e) Arbitrary or capricious or otherwise not in accordance with the law.

*Id.* at 457-58. In reference to this section, this Court said, "[a]dditionally, the Court must adhere to its deferential standard of review of the findings of an administrative agency which the Legislature codified in Miss.Code Ann. § 75-76-125." *Id.* at 457. Sections 75-76-125(2) and (3) are identical to Sections 75-76-171(2) and (3), which are in dispute here. Furthermore, Miss. Code Ann. § 75-76-173(2) states that judicial review as provided in this chapter is the exclusive method of review of the commission's actions. Therefore, the proper standard of review in the instant case is determined by the Act.

¶41. As further support of their position on the standard of review, CDS refers this Court to an identical Nevada standard of review. *See* Nev. Rev. Stat. § 463.3666[5] (Supp. 1998). The "any evidence" standard has also been applied by the Nevada Supreme Court. *M & R Inv. Co. v. Nevada Gaming Comm'n*, 559 P.2d 829 (Nev. 1977) (court's function is to review the evidence presented to the Commission and to determine if there is any evidence to support the decision of the Commission); *see also Nevada Gaming Comm'n v. Consolidated Casinos Corp.*, 575 P.2d 1337 (Nev. 1978) (holding that in reviewing a Gaming Commission decision, the court will examine the record to determine if there is any evidence to support the Commission's order).

¶42. Therefore, the circuit court improperly applied the substantial evidence standard to the Commission's

adoption of the Hearing Examiner's Decision. Regardless, the facts in this record reveal that there is substantial evidence that only a hopper jam occurred.

**I. DID THE CIRCUIT COURT ERR IN CONCLUDING THERE WERE NO FACTS CONTAINED WITHIN THE RECORD UPON WHICH TO BASE A FINDING THAT EFFIE FREEMAN DID NOT WIN A PRIMARY PROGRESSIVE JACKPOT.**

¶43. According to the circuit court, the Hearing Officer's disputed findings are:

> 2. Sometime near 5:00 p.m. Freeman placed a one dollar token into the machine or wagered one credit and played the machine.

> 3. The reels spun and resulted in two ducks, winning symbols, to line up on the payline, with the third duck visible on the reel but not on the payline.

> 8. This activity is more consistent with a hopper problem than a jackpot.

The Hearing Officer's conclusion of law was that the substantial weight of evidence supports a finding that Freeman did not win a Cool Millions jackpot. CDS and the Commission assert that the circuit court improperly refused to yield to the expertise of the Commission and its Hearing Officer's evaluation of the witnesses and evidence. In contrast, Freeman argues that the circuit court properly determined that there was no substantial evidence to support the Hearing Examiner's decision.

¶44. In support of her contentions, Freeman asserts that the Hearing Examiner should not have allowed Garner's report into evidence as incompetent, because it is unsworn, undated, and unreliable. Freeman cites *Calhoun v. Bailar*, 626 F.2d 145 (9th Cir. 1990), in which the Ninth Circuit held that hearsay statements of witnesses which were subsequently disavowed on direct examination constituted substantial evidence sufficient to support an administrative determination. *Id.* Interestingly, *Calhoun* would then seem to support CDS rather than Garner. Further, the Ninth Circuit stated that the strict rules of evidence do not apply in the administrative context. *Id.* at 148. Mississippi has likewise adopted a similar attitude toward administrative proceedings. *See McGowan v. Mississippi State Oil & Gas Bd.*, 604 So.2d 312, 317-18 (Miss. 1992) (the rules of practice, procedure and evidence, formally observed in courts of law, are relaxed in proceedings before administrative agencies).

¶45. CDS contends that under the Mississippi Gaming Commission Regulations, the Hearing Examiner was entitled to include the Garner report in the evidence he considered. According to the regulations:

> Section 6. Admissibility of Evidence. (a) The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence may be admitted and is sufficient in itself to support a finding if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in a civil action.

*Mississippi Gaming Commission Regulations*, H. Player Disputes, effective October 1991. CDS asserts that handwritten witness statements are gathered as a matter of routine by Commission agents, such as Gorman.

¶46. In contrast, Freeman contends that Garner could have been called as a witness by CDS or a proper

affidavit could have been admitted under Mississippi Gaming Regulation III.H. § 5.(b). This Court's standard of review of a trial court's admission or exclusion of evidence is the abuse of discretion standard. *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d 149, 152 (Miss.1997).

¶47. CDS responds that the written report was admissible even under the Mississippi Rules of Evidence (MRE) - 803(1) as the present sense impression of the two witnesses as they stood at the slot machine; under 803(6) as the record of an event made and kept in the regular course of business by the casino; and 803(8) as the public records of the Commission in its conduct of an investigation. Garner's written statement (quoted above) here would qualify, at least in part, as hearsay[6], because Garner alleges statements made by Freeman and others. Hearsay evidence is inadmissible unless it falls within one of the known exceptions.

¶48. In *Watson v. State*, 521 So.2d 1290 (Miss.1988), this Court held that documents which were prepared as part of normal banking procedure were admissible into evidence under MRE 803(6)[7]. *Id*. at 1295. Under Rule 803(6) and the comment, it is not necessary to call or to account for all participants who made the record. However, the source of the material must be an informant with knowledge who is acting in the course of the regularly conducted activity. *Id.* at 1294-95.

¶49. In the instant case, Garner was acting in the course of a regularly conducted activity when she made her report. Moreover, she made the report as required by casino policy and at the request of her superior, JoAnn Jernigan. Finally, there is nothing to suggest untrustworthiness other than Freeman's allegation that Garner moved a reel on the slot machine. Regardless, in *Butler v. Pembroke*, 568 So.2d 296 (Miss. 1990), this Court said that the admission of daily receipt logs and a bookkeeper's summary under MRE 803(6), which had not been timely produced in response to discovery requests and did not possess indicia of trustworthiness, was harmless error. *Id.* at 298. Therefore, the Hearing Examiner did not abuse his discretion in admitting the signed, written statement of Garner, because the strict rules of evidence are relaxed in administrative proceedings and the report here would be admissible even under the rules of evidence.

¶50. Having determined that the Hearing Examiner correctly relied upon the Garner report, our attention can turn to the disputed findings of fact. The first is that Freeman played only one coin or wagered only one credit, the second is that only two ducks or Cool Millions symbols lined up on the payline, and the third is that there was a hopper jam rather than a jackpot. CDS argues that the Hearing Examiner was correct in relying upon the testimony of their witnesses, the Garner report, the computer reports and the surveillance tapes. In contrast, Freeman argues that there was no substantial evidence to support the Hearing Examiner's findings of fact.

¶51. The evidence supporting all of these findings by the Hearing Examiner included the written report of Sandra Garner, the Splash Casino SDS report, the surveillance tapes, and the testimony of Jernigan, Flemmons, and Orr, (described above). In contrast, Freeman asserts that the circuit court properly concluded that such evidence was not substantial evidence to support the Commission's findings.

¶52. Since the circuit court improperly applied the substantial evidence standard, its judgment is reversed and the Commission's determination is reinstated, because under the lesser standard of review of Section 75-76-171(3)--the "unsupported by any evidence" standard--CDS has clearly shown to this Court that some evidence exists to support the Hearing Examiner's findings.

¶53. Even if we were to apply the substantial evidence standard, there is clearly substantial evidence to

support the Hearing Examiner's findings. The Hearing Examiner took into account all the witness testimony, Freeman's testimony, the computer reports, and the surveillance tapes in concluding that Freeman did not win the Cool Millions. It is the role of the Hearing Examiner to make findings of fact. Miss. Code Ann. § 75-76-163 (1991). Therefore, the circuit court must conclude--and did so in this case--that the Hearing Examiner's findings were unsupported by substantial evidence in order to reverse.

¶54. However, contrary to the circuit court's holding, there is substantial evidence to support the Hearing Examiner's decision. First, the circuit court discounted the Garner report. As stated above, the Hearing Examiner did not abuse his discretion in admitting the signed, written statement of Garner, because the strict rules of evidence are relaxed in administrative proceedings and the report here would be admissible even under the rules of evidence.

¶55. Second, the circuit court held that computer signals cannot negate a jackpot. The Hearing Examiner never held that computer signals negate the jackpot. Rather, the computer signals of the slot machine simply corroborate the Garner report, the Jernigan testimony, and the determination of the Commission's agent Gorman.

¶56. Finally, the circuit court chose to rely upon the testimony of Freeman and her witnesses, because they were the only live witnesses. However, the circuit court does not mention the fact that all of these witnesses were Freeman's friends who came to the casino with her that day. These witness-friends of hers did not know anymore about slot machines than the average person, and their testimony was inconsistent. They testified that lights were flashing and bells were ringing. They assumed that Freeman must have won, because to the layman, flashing lights and ringing bells could only have meant that she had won. It never crossed their minds that those same signals could also reflect a hopper jam.

¶57. Therefore, the circuit court should have deferred to the decision of the Commission's Hearing Examiner as the finder of fact. Contrary to the circuit court's holding, there is substantial evidence to support that decision. Accordingly, the circuit court is reversed and the Commission's decision reinstated.

## II. DID THE CIRCUIT COURT ERR IN CONCLUDING THAT THE PATRON DISPUTE PROCESS DENIED EFFIE FREEMAN DUE PROCESS OF LAW.

¶58. The circuit court found that Freeman was not afforded due process of law and reversed the Commission's decision as "in violation of constitutional provisions " pursuant to Miss. Code Ann. § 75-76-171(3)(a) (1991). The circuit court based its reversal on the following four factors:

1. The Commission was not notified of the dispute over the jackpot pursuant to Miss. Code Ann. § 75-76-103.

2. The Executive Director's investigation of the complaint was unsatisfactory.

3. The burden of proof was placed on Effie Freeman pursuant to Miss. Code Ann. § 75-76-163, but all of the information about the case was in the hands of the Gaming Commission, Splash Casino and CDS.

4. The hearing examiner unduly stacked the deck against Freeman by not engaging in *de novo* review.

Both the Commission and CDS argue that the circuit court erred and should be reversed.

Factor Number 1

¶59. The Gaming Control Act states that when the executive director receives notice that there is a dispute over alleged winnings he shall, "conduct whatever investigation is deemed necessary," and shall decide if the licensee should pay the alleged winnings. Miss. Code Ann. § 75-76-159(1)(b) (1991). The circuit court found that the failure of the casino to notify the Commission, as required by the statute, contributed to the denial of due process.

¶60. Neither the Commission nor CDS deny a failure to notify. However, CDS contends that it was unaware of any dispute until its attorneys were faxed a petition for reconsideration in July, 1995, three months after the incident and one month after Splash Casino ceased operations. Moreover, only Freeman and Splash Casino knew of any possible dispute at the time of the incident. The issue of whether there was a dispute about Freeman winning the jackpot is itself in dispute. Freeman claimed that she won and was attempting to talk with a supervisor but was not allowed to discuss her alleged winning with anyone. In contrast, Garner and Jernigan believed Freeman was satisfied that she had only won $5.00 rather than the Cool Millions jackpot. Thus, no dispute existed to them.

¶61. Miss. Code Ann. § 75-76-159 (1)(a) & (b) are clear. They state as follows:

(1) Whenever a licensee refuses payment of alleged winnings to a patron, the licensee and the patron are unable to resolve the dispute to the satisfaction of the patron and the dispute involves:

(a) At least Five Hundred Dollars ($500.00), the licensee shall **immediately** notify the executive director; or

(b) Less than Five Hundred Dollars ($500.00), the licensee **shall inform the patron** of his right to request that the executive director conduct an investigation.

Miss. Code Ann. § 75-76-159 (1)(a) & (b) (1991) (emphasis added). It is uncontested that Splash Casino did neither in this case. What is contested is whether Freeman and Splash Casino were "unable to resolve the dispute to the satisfaction of the patron."

¶62. CDS argues that Freeman chose not to sue Splash Casino. Furthermore, according to Jernigan's testimony, Freeman did not appear to dispute Garner's explanation at the time, nor did she appear from the surveillance tapes to consider the matter in dispute when she left the casino. Therefore, since CDS was unaware of a dispute and Splash Casino did not believe the matter to be in dispute, it is presumptuous to characterize the failure to notify the Commission as a denial of due process.

¶63. Assuming Splash Casino should have notified and failed, then the appropriate remedy is addressed by Miss. Code Ann. § 75-76-159 (3), which states that "[f]ailure to notify the executive director or patron as provided in subsection (1) is grounds for disciplinary action pursuant to 75-76-103 through 75-76-119, inclusive." The circuit court is therefore correct in stating that "[t]here is no evidence that either Splash or CDS were disciplined for violation of this reporting requirement." However, a failure to notify would not entitle Freeman to the jackpot winnings which the evidence shows she did not win. Otherwise, this Court would be unduly punishing CDS beyond the mandates of the statute and granting Freeman a jackpot she did not win.

¶64. Furthermore, due process has not been violated here. Freeman was not prejudiced by the failure to

notify the Commission. She ultimately received all the process due according to the mandate of the Legislature. She had ample opportunity to put on all the testimony and evidence which she desired.

## Factor Number Two

¶65. The Commission asserts that the statutory structure gave her a full evidentiary hearing at which to testify and put on all evidence favorable to her claim, regardless of whether the agent failed to interview her. Moreover, CDS argues that the circuit court did not state what information material to the outcome of the investigation the agent would have discovered that he did not already have. As evidence in support of this argument, CDS refers this Court to the June 6, 1995 letter of Freeman's counsel to the Commission from which the agent knew the date of the incident; the location of the machine; Freeman's statement regarding what happened; her claim to having won the progressive jackpot; and what the casino personnel told her regarding the hopper jam. Finally, any injury arising from the agent's failure to interview Freeman was cured by the opportunity she was given at the *de novo* hearing to provide the trier of fact, the Hearing Examiner, with all evidence possessed personally and her witnesses.

## Factor Number Three

¶66. In regards to factor three, the Commission responds that the Hearing Examiner simply followed the mandate of the statutory scheme as passed by our state legislature. *See* Miss. Code Ann. § 75-76-161 (1991). Further, Miss. Code Ann. § 75-76-163(1) specifically puts the burden on the petitioner.

¶67. The Commission points out that a similar burden is put on the petitioner throughout Mississippi law. ***Mississippi Dep't of Corrections v. McClee***, 677 So.2d 732, 734 (Miss. 1996); *see also* ***Ricks v. Mississippi State Dep't of Health***, 719 So.2d 173 (Miss. 1998)(holding that a rebuttable presumption in favor of the action of an administrative agency and the burden of proof is upon one challenging its action); ***State v. Beebe***, 687 So.2d 702 (Miss. 1996)(party challenging administrative agency's actions maintains the burden of proof); *accord* **City of Durant v. Humphreys County Mem. Hosp.**, 587 So.2d 244, 251 (Miss.1991); **Gill v. Mississippi Dep't of Wildlife Conserv.**, 574 So.2d 586, 593 (Miss.1990). We agree and find no error here.

## Factor Number Four

¶68. The circuit court determined that the Hearing Examiner "stacked the deck" against Freeman by not allowing her a *de novo* review. The Commission argues that the hearing was a "trial anew," except for the agent's findings.

¶69. CDS supports this conclusion by the Commission and argues that Freeman was in fact given a *de novo* review, because the Hearing Examiner judged the demeanor and credibility of all of the witnesses and exhibits and determined that the substantial weight of the evidence supported a finding that Freeman did not win the progressive jackpot. *See* **Pearson v. Parsons**, 541 So.2d 447 (Miss. 1989). In **Pearson**, this Court said that "[i]t is a trial de novo when new and additional evidence is received by the Tribunal in addition to the proceedings below and when the executive committee's findings are not considered as conclusive."*Id.* at 453. CDS argues that the record indicates that the Hearing Officer heard sixteen hours of testimony from eleven witnesses and reviewed sixteen exhibits. He did allow Freeman every opportunity to put on her case, and did not simply make his determination based only on the Commission agent's report.

¶70. Freeman asserts that the circuit court was correct in holding that the Hearing Examiner in effect acted

as an appellate court when it said that "[t]he burden in this case is upon the Appellant, Ms. Freeman, to establish that the decision of the enforcement agent is not supported by substantial evidence." Clearly, the circuit court is correct that the Hearing Examiner misstated the standard of review. Miss. Code Ann. §75-76-161 outlines the procedure for reconsideration of the executive director's decision (in this case in the form of the agent's findings). The section fails to specifically state whether the standard of review is *de novo* or otherwise. *See* Miss. Code Ann. §75-76-161 (1991).

¶71. However, *de novo* review is the most likely and fair standard, because this hearing is the first chance for the petitioner to present her formal case to the Commission. Furthermore, Miss. Code Ann. § 75-76-163(2) states that after the hearing, the Hearing Examiner may sustain, modify, or reverse the previous decision, and it specifically requires the Hearing Examiner's decision to be in writing and to include a finding of fact. This type of statutory authority is synonymous with *de novo* review. Thus, Freeman's burden should have been stated by the Hearing Examiner as a preponderance of the evidence instead.

¶72. Despite the Hearing Examiner's misstatement of the standard of review at the reconsideration hearing, he found that "the substantial weight of the evidence favors the decision of the enforcement agent." Coupled with the extensive testimony and presentation of evidence, the Hearing Examiner's findings of fact should not be overturned for the harmless error of misstating the standard of review.

¶73. CDS and the Commission assert that the opportunity that a patron has to request a hearing and to put on witnesses and evidence before a trier of fact meets the requirements of due process. In ***Booth v. Mississippi Employment Sec. Comm'n***, 588 So.2d 422 (Miss. 1991), this Court stated the due process required in administrative settings, as follows:

> [A]n administrative board must afford minimum procedural due process under the Fourteenth Amendment to the United States Constitution and under Art. 3, § 14 of the Mississippi Constitution consisting of (1) notice and (2) opportunity to be heard. ***State Oil & Gas Board v. McGowan***, (542 So.2d 244) at 248 ((Miss.1989)); *citing **Phillips Petroleum Co. v. Shutts**, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)*; ***Davis v. Scherer**, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)*; ***Board of Regents v. Roth**, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)*.

*Id.* at 428.

¶74. The circuit court cited ***Mathews v. Eldridge**, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)*, where the Supreme Court found that an evidentiary hearing prior to termination of disability benefits was not required. In so finding, it stated that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 335, 96 S.Ct. at 902, 47 L.Ed.2d at 33. This Court accepted ***Mathews*** in ***Natural Father v. United Methodist Children's Home***, 418 So.2d 807, 810 (Miss.1982).

¶75. Freeman was given an opportunity to be heard at a meaningful time and in an appropriate manner at the reconsideration hearing. Therefore, we hold that circuit court is reversed and the decision of the Commission reinstated, because the requirements of due process have been satisfied.

¶76. However, we note that there are many procedural errors and several coincidences here that are at least suspicious. First, this dispute would have much more easily been resolved if Splash or CDS had

properly notified the Commission in accord with the statute. Furthermore, we take this opportunity to stress to the Commission the importance for strictly enforcing the above-cited casino patron dispute statutes in the future to protect patrons.

¶77. Second, the video tape exhibits in this case failed to record the alleged winning play of Freeman. Apparently the mere coincidence of a routine tape change at 5:00 p.m. was to blame. Every six hours the tapes are changed and a regularly scheduled change occurred at exactly 5:00 p.m. Other routine tape changes for the surveillance videos occur at 11:00 p.m., 5:00 a.m., and 11:00 a.m. A back-up system would have prevented this mishap. Because the integrity of the gaming industry is at stake in these types of cases, the Legislature and the Commission should consider amending the statutes or mandating further internal regulations to protect patrons including, but not limited to, the following: (1) requiring casinos to "lock down" (remove from further play) a slot machine which is involved in a casino patron dispute until such time as a Commission agent can investigate; and (2) requiring casinos to immediately notify the Commission and to inform patrons of their rights any time any type of dispute is had with a patron regardless of whether it appears the patron has been satisfied.

¶78. In spite of believing Freeman was satisfied, here Jernigan stated that she was concerned about Freeman's friends influencing her at a later time to claim that she had won the jackpot, and that was her reason for requiring the written report from Garner and saving the videotapes. We cannot stress enough that patrons are at the mercy of gaming system and the law, and the judicial system is their only current safeguard.

## CONCLUSION

¶79. Despite the admitted procedural failures of Splash and CDS, the Circuit Court of Tunica County should have deferred to the decision of the Commission's Hearing Examiner as the finder of fact. Contrary to the circuit court's holding, there is enough evidence, under either the any evidence or substantial evidence standard, to support that decision.

¶80. Freeman was given an opportunity to be heard at a meaningful time and in an appropriate manner at the reconsideration hearing. Accordingly, we reverse and render the judgment of the Circuit Court of Tunica County, and we reinstate the decision of the Commission.

¶81. **REVERSED AND RENDERED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS AND WALLER, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS, J. PRATHER, C.J., AND COBB, J., NOT PARTICIPATING.**

### McRAE, JUSTICE, DISSENTING:

¶82. The typical patron who enters a casino to while away the hours at a slot machine is expected to know nothing of the Gaming Control Act and much less about the gaming regulations that strictly monitor and control Mississippi's casino industry. To the extent that those regulations protect the interests of the patron,

the statutes and regulations must be strictly enforced inasmuch as the patron is at the complete liberty of the casino when it comes to the procedures for determining whether a jackpot will or will not be paid out. Because the casino here utterly failed to follow those statutes and regulations and that failure, as may be expected, worked to the detriment of the patron, I must dissent

¶83. On April 8, 1995, Effie Freeman was playing the "Cool Millions" progressive slot machine at Splash Casino in Tunica County when three ducks lined up on the pay line, lights on the machine flashed, and a bell loud enough to be heard throughout the casino began ringing. Ms. Freeman, thinking she had just won a $1, 742,000 jackpot, was understandably excited. Her enthusiasm must have dimmed when a slot attendant, Sandra Garner, came over to the slot machine, opened it up, tinkered with the machine, and paid Ms. Freeman $5.00 in tokens. Understandably aggrieved, Ms. Freeman hired a lawyer and sought redress with th e Mississippi Gaming Commission. The Commission's Hearing Examiner determined that Ms. Freeman did not win the jackpot; instead, the machine had malfunctioned in a manner known as a hopper tilt. Ms. Freeman appealed this ruling to the Circuit Court of Tunica County which reversed "finding that the substantial rights of [Ms. Freeman] have been prejudiced because the Commission's decision is not supported by substantial evidence, is arbitrary and capricious and is otherwise not supported by law." The circuit court's decision was correct and should be affirmed.

¶84. The Gaming Control Act is very specific about the procedures to follow when there is a patron dispute. These procedures serve to protect the interests of both patron and casino. In this case, the failure of the casino to follow the Gaming Control Act requirements worked to the detriment of Ms. Freeman. Miss. Code Ann. § 75-76-159 (1991) requires that whenever there is a patron dispute in excess of $500.00, the casino must immediately notify the executive director of the Gaming Commission so that an investigation, if necessary, may be commenced forthwith. Had the Commission been notified here, witness statements could have been taken and the machine itself could have been sealed.

¶85. Unfortunately, the failure of the casino to follow the procedures dictated by law meant that the first time that the Commission knew of the dispute was two months later when notified via a letter from Ms. Freeman's lawyer. The Commission at that time sent an investigator to look into the matter. The investigator determined that the machine had gone into tilt mode. The investigation, however, was done without an examination of the actual machine as it existed at the time of the alleged jackpot inasmuch as the casino's failure to follow the procedures dictated by Mississippi law resulted in the failure to preserve the machine. Where a party's actions result in the spoliation of evidence, it is presumed that the evidence would not have been favorable to that party. *Tolbert v. State*, 511 So.2d 1368, 1372 (Miss. 1987); *Coyne v. State*, 484 So.2d 1018 (Miss. 1986); *Washington v. State,* 478 So.2d 1028, 1032-33 (Miss. 1985). In this case, because of the casino's failure to follow the dictates of Miss. Code Ann. § 75-76-159 (1991), it must be presumed that the slot machine would have been evidence unfavorable to the casino.

¶86. The second instance where regulations were not followed to the disservice of Ms. Freeman was in the use at the hearing of an unsworn statement of the slot attendant who serviced the machine after Ms. Freeman's win. Sandra Garner's statement was the only eyewitness evidence to the effect that Ms. Freeman did not win the jackpot. Not only did Ms. Garner not testify at the hearing, her evidence was provided in the form of an unsworn statement. While the Gaming Commission regulations allow for evidence in the form of affidavits (Reg. III H, §5(b)), even this minimal standard was not met. Moreover, pursuant to Miss. Code Ann. § 75-76-111(3) (1991), a party who intends to rely on at affidavit at the hearing must give notice. Sandra Garner's statement was not sworn and notice was not properly given to Ms. Freeman of its

anticipated use. For these reasons, the Circuit Court was correct in determining that this hearsay evidence should not have been considered by the Commission.

¶87. In this case, substantial evidence in support of the Commission's decision was lacking. All of the persons who witnessed Ms. Freeman's jackpot stated that they heard loud bells ringing from the slot machine, lights were flashing, and three ducks in red, white and blue were lined up on the payoff line. The noise and lights were such that a crowd gathered around the machine.

¶88. Supporting Ms. Freeman, then, was all of the eyewitness testimony as well as the presumption that the slot machine itself would have been unfavorable to the casino. Since the statement of Sandra Garner was inadmissible, the evidence that Ms. Freeman did not win the Cool Millions consisted only of a surveillance videotape and the slot machine print out. As noted by the circuit court, the videotape failed to capture Ms. Freeman's winning moment and was of such poor quality it was not possible to determine whether Ms. Freeman was playing one coin or three. The decision of the Commission that Ms. Freeman did not win the jackpot is not supported by substantial evidence.

¶89. To summarize, I agree with the circuit court that the hearing examiner used the wrong standard of evidence and, therefore, placed an unduly high burden on the plaintiff. Furthermore, the failure of the casino to follow the rules and preserve the slot machine in the condition it was in at the time of the alleged jackpot results in an inference that the evidence the machine represents was against the casino. Finally, I believe that the hearing examiner should not have been permitted to rely on the unsworn hearsay statement of Sandra Garner. For all of these reasons, the trial court's decision should be affirmed or, at the very least, this matter remanded for another hearing wherein the statement of Sandra Garner would not be admissible and the failure of the casino to notify the Commission of the patron dispute would provide an inference that the slot machine was unfavorable to the casino.

¶90. Accordingly, I dissent.

**MILLS, J., JOINS THIS OPINION.**

1. Splash Casino employee Sandra Garner did not testify in person.

2. Splash Casino employee Edna Erwin did not testify in person.

3. Splash Casino routinely changed video-tapes on the surveillance cameras at 5:00 a.m., 11:00 a.m., 5:00 p.m., and 11:00 p.m.

4. Jernigan stated that the SDS report was running a consistent twelve minutes behind the surveillance tape times.

5. Nev.Rev. Stat. § 463.3666(2) and (3) state, as follows:

> 2. The review must be conducted by the court sitting without a jury, and must not be a trial de novo but is confined to the record on review. The filing of briefs and oral argument must be made in accordance with the rules governing appeals in civil cases unless the local rules of practice adopted in the judicial district provide a different procedure.

> 3. The reviewing court may affirm the decision and order of the board or the hearing examiner, or it

may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:

(a) In violation of constitutional provisions;

(b) In excess of the statutory authority or jurisdiction of the board or the hearing examiner;

(c) Made upon unlawful procedure;

(d) Unsupported by **any evidence**; or

(e) Arbitrary or capricious or otherwise not in accordance with law.

(emphasis added).

6. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c).

7. Rule 803(6), Mississippi Rules of Evidences, provides:

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.